Case Number:13-003971-CI

Electronically Filed 04/11/2013 12:32:20 PM ET

***ELECTRONICALLY FILED 4/15/2013 12:35:19 PM: KEN BURKE, CLERK OF THE CIRCUIT COURT, PINELLAS COUNTY***

## RESERVATION AGREEMENT

**NAME OF APPLICANT:** ES RESOURCES, LLC

**ADDRESS:** 321 TURNER ST.
CLEARWATER, FL 33756

**TELEPHONE:** 727-449-1476  **FAX:** 727-449-0499

**EMAIL:** topbird@hotmail.com  **FEIN:** 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 (HELP)

1.  **Reservation Deposit.** AS PTO, LLC, a Florida limited liability company, its successors and/or assigns ("Seller"), acting as agent for JBI, Inc. a Nevada corporation ("JBI"), acknowledges receiving this date from ES RESOURCES, LLC ("Purchaser") a reservation deposit in the amount of $100,000.00 (the "Reservation Deposit") payable to the Trust Account of MacFarlane, Ferguson & McMullen, P.A. ("Escrow Agent"). The Reservation Deposit expresses Purchaser's interest in purchasing a License for the marketing and exploitation of the Plastic2Oil technology from Seller on behalf of JBI, the owner and developer of such technology. While the price of the License is initially estimated to be $250,000, the same may be modified by the price schedule prevailing at the time of formal License (the "Contract"). The parties acknowledge, however, that such price is not a firm price and the future price set by Seller could vary substantially. If Buyer is not agreeable to the price as determined by Seller, Buyer shall have the cancellation rights set forth below.

2.  **Escrow Agreement.** The Reservation Deposit will be held in escrow by the Escrow Agent whose address is 625 Court Street, Clearwater, FL 33756. Purchaser will receive a receipt for the Reservation Deposit from the Escrow Agent.

3.  **Execution of Contract and Rights of Cancellation of Reservation Agreement.** Purchaser will have ten (10) days after receipt of Seller's formal Contract in which to sign and return the Contract to Seller together with the amount, if any, that the initial deposit required by the Contract exceeds the Reservation Deposit. If Purchaser does not sign and return the Contract (with the balance of the initial Contract deposit, if any) within this ten (10) day period, this Reservation Agreement will be canceled automatically and the Reservation Deposit will be refunded to Purchaser. Furthermore, either party hereto may cancel this Reservation Agreement by notifying the other and the Escrow Agent in writing at any time before Purchaser signs the Contract, whereupon the Reservation Deposit will be promptly refunded to Purchaser without qualification. In the event that the Contract, for whatever reason, is not executed by Purchaser and Seller within six (6) months following the date of the Reservation Agreement, this Reservation Agreement shall be deemed null and void, whereupon Seller shall then cause Escrow Agent to return the Reservation Deposit to Purchaser, and thereafter Purchaser and Seller shall be relieved of all obligations to each other.

If Purchaser timely signs and returns the Contract to Seller and Seller then signs it and returns a fully signed copy of same to Purchaser, the Reservation Deposit will be turned over to Seller and credited against the initial deposit required under the Contract. The Escrow Agent named above will not release the Reservation Deposit except as provided in this Reservation Agreement or the Escrow Agreement.

The Reservation Deposit will be placed, within seven (7) business days after receipt by Escrow Agent, at a FDIC insured banking institution. Purchaser must forward an executed Form W-9 as a condition to such account bearing interest. The interest earned will be disbursed in the same manner and at the same time as the Reservation Deposit.

Purchaser recognizes that this Reservation Agreement is a reservation solely with respect to a proposed Contract; and, accordingly, this Reservation Agreement is not an agreement to transfer a License, nor does it confer any lien upon or interest in the technology or an entitlement to a Contract or License.



4.     Limitation of Liability.  The liability of the Seller, JBI and Escrow Agent hereunder is at all times strictly and solely limited to the return of the Reservation Deposit.

5.     Notices.  Any Notices permitted or required under this Reservation Agreement shall be deemed to have been delivered if deposited in writing in the United States mail, postage prepaid, certified or registered mail, return receipt requested, addressed to Seller and to Buyer at the addresses set forth herein.

6.     Assignment.  Purchaser shall not have the right to assign this Reservation Agreement.

EXECUTED as of the _12th_ day of _Feb_ , 2010.

SELLER:

AS PTO, LLC,
a Florida limited liability company.

By: _____
            Albert Sousa, Manager

PURCHASER(S):

Name: _ES RESOURCES LLC_____

Name: _MARKIS K. LAGOS_____

ESCROW AGENT:

MacFarlane, Ferguson & McMullen, P.A.

By: _____
            J. Paul Raymond

Escrow Agent:        MacFarlane, Ferguson & McMullen, P.A.
                     Attn: J. Paul Raymond, Esq.
                     625 Court St.,   Suite 200
                     Clearwater, FL 33756
                     727-584-7215
                     Fax: 727-442-8470
                     Email: JPR@macfar.com

Seller:              AS PTO, LLC
                     Attn: Geoffrey Weber
                     221 Turner Street,
                     Clearwater, Florida 33756
                     (727) 449-1476
                     Fax: 727 449-0199
                     Email: Geoff@plastic2oil.com

Case Number:13-003971-CI

Electronically Filed 04/11/2013 12:32:20 PM ET

No interest in or Unit of the Company has been registered with the securities and exchange commission under the Securities Act of 1933, as amended, the Florida Securities and Investor Protection Act, or with any other securities regulatory authority under any other securities law. Resales and other assignments and transfers of such units are restricted hereby and under federal, Florida, and possibly other securities laws and regulations.

***ELECTRONICALLY FILED 4/15/2013 12:35:19 PM: KEN BURKE, CLERK OF THE CIRCUIT COURT, PINELLAS COUNTY***

# OPERATING AGREEMENT

## OF

# PLASTIC 2 OIL of CLEARWATER 1, LLC

February 12, 2010

FYI...

Andy needs

to sign

LINDA BURR

# TABLE OF CONTENTS

**Page**

| | | |
|---|---|---|
| ARTICLE I | DEFINITIONS | 1 |
| 1.1 | Defined Terms | 1 |
| 1.2 | Gender and Number | 7 |
| 1.3 | Headings | 7 |
| 1.4 | Certain Words | 7 |
| 1.5 | Cross References | 7 |
| ARTICLE II | NAME, OFFICES, REGISTERED AGENT, TERM, AND CERTAIN FILINGS | 8 |
| 2.1 | Term | 8 |
| 2.2 | Name | 8 |
| 2.3 | Principal Office and Registered Agent | 8 |
| 2.4 | Filings | 8 |
| ARTICLE III | PURPOSES, POWERS, AND INVESTMENTS | 9 |
| 3.1 | Purpose | 9 |
| 3.2 | Powers | 9 |
| 3.3 | Liquid Funds; Title to Property | 10 |
| ARTICLE IV | OWNERSHIP, UNITS, CONTRIBUTION AGREEMENTS | 10 |
| 4.1 | Ownership; Class A Units; Class B Units | 10 |
| 4.2 | Voting Rights | 10 |
| 4.3 | No Certificates | 10 |
| 4.4 | Reliance on Ownership Records | 10 |
| 4.5 | Units as Personalty | 11 |
| ARTICLE V | MEMBERS | 11 |
| 5.1 | Current Members | 11 |
| 5.2 | Substitute Members | 11 |
| 5.3 | Resignation | 12 |
| 5.4 | Powers | 12 |
| 5.5 | Relationship of Members | 12 |
| 5.6 | Partition | 12 |
| 5.7 | Representations and Warranties | 13 |
| 5.8 | Compensation of Members | 13 |
| 5.9 | Other Ventures | 13 |
| ARTICLE VI | CONTRIBUTIONS AND TRANSACTIONS WITH MEMBERS AND OTHERS | 14 |
| 6.1 | Capital Contributions for Units | 14 |
| 6.2 | Additional Contributions | 14 |
| 6.3 | No Interest on Capital Contributions | 14 |
| 6.4 | Priority | 14 |
| 6.5 | No Withdrawal | 14 |
| 6.6 | Loans and Other Transactions with Members, the Managers and Their Affiliates | 14 |
| 6.7 | No Requirement to Guaranty Company Debt | 15 |
| ARTICLE VII | DISTRIBUTIONS OF CASH AND ALLOCATIONS OF PROFIT AND LOSS | 15 |
| 7.1 | Distributions Generally | 15 |
| 7.2 | Amounts and Priority Distributions | 16 |

| | | |
|---|---|---|
| 7.3 | Restrictions on Distributions. | 16 |
| 7.4 | Re-distribution among Members | 17 |
| 7.5 | Amounts Withheld | 17 |
| 7.6 | Capital Accounts. | 17 |
| 7.7 | General Rules for Allocation | 18 |

**ARTICLE VIII TAX MATTERS** ..................................................................... 20
| | | |
|---|---|---|
| 8.1 | Tax Status. | 20 |
| 8.2 | Tax Matters Member. | 20 |

**ARTICLE IX ACTIONS OF MEMBERS** .......................................................... 21
| | | |
|---|---|---|
| 9.1 | Voting Power; Meetings | 21 |
| 9.2 | Place of Meetings | 21 |
| 9.3 | Notice of Meetings | 21 |
| 9.4 | Meeting of All Members | 22 |
| 9.5 | Record Dates | 22 |
| 9.6 | Conduct of Meetings. | 22 |
| 9.7 | Quorum | 22 |
| 9.8 | Voting | 22 |
| 9.9 | Proxies | 23 |
| 9.10 | Action by Members Without A Meeting | 23 |
| 9.11 | Waiver of Notice | 24 |
| 9.12 | Participation by Electronic Communications | 24 |
| 9.13 | Company Actions Requiring Managin Member and Wright Approval | 24 |

**ARTICLE X MANAGING MEMBER; OFFICERS** ............................................ 25
| | | |
|---|---|---|
| 10.1 | Managing Member; Management of the Company | 25 |
| 10.2 | Restrictions. | 25 |
| 10.3 | Discontinuance of Authority and Duties of Managing Member | 25 |
| 10.4 | Officers. | 25 |
| 10.5 | Other Agents | 26 |
| 10.6 | Payment of Company Expenses | 26 |
| 10.7 | Payment of ManagersExpenses | 27 |

**ARTICLE XI LIABILITY, INDEMNIFICATION, AND EXCULPATION** ....... 27
| | | |
|---|---|---|
| 11.1 | Limitations on and Exculpation from Liability, | 27 |
| 11.2 | Indemnification. | 28 |
| 11.3 | Insurance | 30 |

**ARTICLE XII RECORDS AND REPORTS** ...................................................... 30
| | | |
|---|---|---|
| 12.1 | Records to be Maintained | 30 |
| 12.2 | Form of Maintenance | 31 |
| 12.3 | Place of Maintenance. | 31 |
| 12.4 | Inspection | 31 |
| 12.5 | Financial and Tax Reporting; Accounting Methods | 32 |
| 12.6 | Annual Reports. | 32 |
| 12.7 | Tax Returns. | 32 |

**ARTICLE XIII TRANSFER OF UNITS** ............................................................ 32
| | | |
|---|---|---|
| 13.1 | General Restrictions | 32 |
| 13.2 | Exceptions to General Restrictions | 33 |
| 13.3 | Further Restrictions | 33 |
| 13.4 | Right of First Refusal | 33 |
| 13.5 | Recognition. | 34 |
| 13.6 | Indemnification | 34 |

-ii-

| 13.7 | Effective Date | 34 |
| 13.8 | Costs | 34 |
| 13.9 | Reasonableness of Restrictions; Specific Enforcement | 34 |
| 13.10 | Right of Co-Sale | 35 |
| 13.11 | Required Sales | 37 |

**ARTICLE XIV  DISSOLUTION, LIQUIDATION, AND TERMINATION** ...... 37

| 14.1 | Additional and Substitute Members | 37 |
| 14.2 | Events Causing Dissolution | 37 |
| 14.3 | Notice of Dissolution | 37 |
| 14.4 | Liquidation | 37 |
| 14.5 | Termination | 38 |
| 14.6 | Claims of Members | 38 |
| 14.7 | Compensation of Liquidator | 38 |

**ARTICLE XV  MISCELLANEOUS** ...... 38

| 15.1 | Notices | 38 |
| 15.2 | Amendment | 39 |
| 15.3 | Binding Effect | 40 |
| 15.4 | Waiver of Right to Decree of Dissolution | 41 |
| 15.5 | Waiver | 41 |
| 15.6 | Enforcement Costs | 41 |
| 15.7 | Counterparts; Facsimile Delivery | 41 |
| 15.8 | Further Assurance | 42 |

**ARTICLE XVI  CONSTRUCTION** ...... 42

| 16.1 | Integration | 42 |
| 16.2 | Governing Law | 42 |
| 16.3 | Relationship of Agreement to Act | 42 |
| 16.4 | Severability | 42 |
| 16.5 | Cumulative Remedies | 42 |
| 16.6 | Rights of Creditors and Third Parties | 43 |
| 16.7 | Legal Representation | 43 |
| 16.8 | Time | 43 |
| 16.9 | Schedules | 43 |

# OPERATING AGREEMENT

## OF

# PLASTIC 2 OIL CLEARWATER 1, LLC, LLC

This Operating Agreement of **PLASTIC 2 OIL OF CLEARWATER 1, LLC** (the "Agreement") is effective as of the 12th day of February, 2010 (the "Effective Date"), and is made and entered into by and among the Persons listed as Members on **Schedule A**, and Persons who later become Members, or Assignees of the Company.

In consideration of the mutual covenants and undertakings contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

### ARTICLE 1
### DEFINITIONS

#### 1.1   Defined Terms.

*Act* means the Delaware Limited Liability Company Act, governing, among other matters, certain aspects of the formation, operation, and dissolution of Delaware limited liability companies, as the same may be amended from time to time.

*Additional Member* means any Person admitted to the Company as a Member pursuant to Section 5.2.

*Affiliate* means, with respect to a particular Person, (i) any Person who directly or indirectly Controls, is Controlled by, or is under common Control with such Person, (ii) any director, governor, partner, trustee, member, officer, manager, employee or the like of either such Person or an Affiliate of such Person, and (iii) any member of such Person's or his spouse's Immediate Family, any in-law, or any parent or child of any Immediate Family member or of any in-law of such Person or his spouse.

*Agreement* means this Operating Agreement, as the same may be modified, amended, supplemented, and/or restated from time to time.

-1-

209540v1

***Allocation Regulations*** means the Treasury Regulations promulgated under Code Section 704(b) (regarding partners' distributive shares of partnership tax items), as currently in effect, and as modified and clarified by amendment, successor regulation, ruling, court decision or other Treasury Regulation relating to partners' distributive shares.

***Articles*** means the Articles of Organization of the Company filed with the Department on **February 2, 2010**, as amended from time to time hereafter in accordance with this Agreement and applicable law.

***Assignee*** means a Person in respect of Units of any Class previously issued or outstanding that have been transferred or otherwise assigned to him as permitted hereby or otherwise by law but who has not been admitted as a Substitute Member in respect thereof and who thus is subject to all the obligations and restrictions on his predecessors in interest in respect of such Units but is entitled only to receive the economic benefits of those Units and not to exercise any governance rights associated with them except as set forth in Section 15.2(c).

***Bankruptcy*** means and includes: (i) an assignment for the benefit of creditors; (ii) the filing of a voluntary petition in bankruptcy; (iii) adjudication as a bankrupt or insolvent; (iv) filing for oneself of a petition or answer seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation; (v) filing an answer or other pleading admitting or failing to contest the material allegations of a petition filed against one in any proceeding of the type referred to in the foregoing clause (iv); (vi) seeking consent to, or acquiescing in, the appointment of a trustee, receiver, or liquidator of the Person in question or of all or any substantial part of his property; (vii) the expiration of ninety (90) days or more since the commencement of any proceeding seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief of or in respect of the Person under any statute, law, or regulation, if the proceeding has not been dismissed prior thereto; (viii) the expiration of ninety (90) days or more since the appointment, without a Person's consent or acquiescence, of a trustee, receiver, or liquidator of such Person or of all or any substantial part of his property, if such appointment has not been vacated or stayed prior thereto; or (ix) the expiration of ninety (90) days since the expiration of any such stay, if such appointment has not been vacated.

***Capital Account*** has the meaning specified in Section 7.6.

***Capital Contribution*** means the total amount of cash and the Net Asset Value of property other than cash that is contributed to the Company as capital by such Member with respect to such Member's Units. Unless otherwise specified in this Agreement, any reference in this Agreement to the Capital Contribution of a Member shall include a Capital Contribution previously made by any predecessor Member attributable to the Units owned by such Member.

-2-

209540v1

*Cause Event* means the occurrence of any of the following events: (i) a Manager shall have intentionally and materially breached his/her material obligations under this Agreement which breach shall have had, or is reasonably likely to have, a material adverse effect on the Company and such breach has not been cured prior to the 60th day following written notice thereof delivered to the Manager by a Majority of the Class B Members (ii) the Manager shall have been convicted of a felony, which breach or conviction shall have had, or is reasonably likely to have, a material adverse effect on the Company.

*Certified Public Accountant* means an accountant who has passed the uniform certified public accountant examination, is a member of the AICPA and is licensed to practice in **Florida**.

*Class A Member* means a Member who contributes cash as a Capital Contribution to the Company or who has guaranteed a loan granted to the Company and who own Class A Units.

*Class A Percentage* means a Class A Member's percentage ownership in Class A determined by dividing the Member's number of Class A Units by the total number of issued and outstanding Class A Units.

*Class A Unit* means a Class A limited liability company membership interest, or unit of ownership, in the Company.

*Class B Member* means Members who contribute cash as a Capital Contribution to the Company and who own Class B Units.

*Class B Percentage* means a Class B Member's percentage ownership in the Company determined by dividing the Member's number of Class B Units by the total number of issued and outstanding Class B Units.

*Class B Unit* means a Class B limited liability company membership interest, or unit of ownership, in the Company.

*Code* means the Internal Revenue Code of 1986, as amended from time to time, or the corresponding provisions of any subsequent federal income tax law.

*Company* means **Plastic 2 Oil of Clearwater 1, LLC** a Delaware limited liability company.

*Contribution Agreement* means the subscription agreement, entered into by a Person to make a Capital Contribution with respect to one or more Units.

-3-

209540v1

*Control* and variations thereof means possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract, or otherwise.

*Co-sale Transaction* has the meaning given such term in Section 13.11.

*Covered Person* means the Managing Member, any Member, and any Affiliate of the Company, the Managing Member, or a Member, including without limitation, William Wright.

*Department* means the Department of State of the State of Delaware.

*Disinterested* means that a Person (i) is not himself a party to the contract, transaction, undertaking or matter at hand or in issue, (ii) does not directly or indirectly Control, nor is Controlled by or under common Control with, a party to the contract, transaction, undertaking, or matter at hand or in issue (iii) is not an Immediate Family member, grandchild, great grandchild, in-law, or parent or child of an in-law of, any Person who is himself, or who Controls, is Controlled by, or is under Common Control with, a party to the contract, transaction, undertaking, or matter at hand or in issue, and (iv) is not otherwise an Affiliate of any Person who is himself, or who Controls, is Controlled by, or is under Common Control with, a party to the contract, transaction, undertaking, or matter at hand or in issue.

*Effective Date* means **February 2, 2010**.

*Entity* means any Person other than an individual.

*Excess Cash Flow* with respect to any period shall mean, as determined by the Managers in its sole and absolute discretion, the amount of cash received by the Company during the period from all sources, other than capital contributions, less: (a) operating expenses and taxes paid during such period; (b) interest and principal paid during such period on any indebtedness of the Company; (c) expenditures for capital items paid by the Company during such period (other than from cash reserves); (d) other liabilities of the Company paid during such period; and (e) such reserves in the amount of at least $5,000, as shall be determined from time to time by the Managers to be necessary or appropriate to meet the reasonable business needs of the Company, including the payment, when due, of obligations of the Company, reserves against possible losses or reimbursement expenses, and reserves for intended expenditures; and increased by any amount previously reserved that has not been expended and which, in the determination of the Managing Member, is no longer necessary to reserve and thus is available for distribution. Excess Cash Flow shall be determined in accordance with the cash receipts and disbursements method of accounting and otherwise in accordance with generally accepted accounting principles, consistently applied. Excess Cash Flow may be reduced

-4-



by depreciation, amortization, or other non-cash items, as the Managers may reasonably determine.

*Fiscal Year* means the calendar year, except that the Company's last Fiscal Year shall end on the date of the filing with the Department of Articles of Dissolution and all extensions and replacements thereof.

*GAAP* has the meaning given such term in Section 12.5.

*IRS* means the United States Internal Revenue Service.

*Immediate Family* of an individual means and includes the individual's spouse, children, parents, and siblings (in each case, whole or half).

*Interested* means not Disinterested.

*Independent Certified Public Accountant* means a Certified Public Accountant who is independent pursuant to the standards and performance criteria of the AICPA.

*Liquidator* means a Person or group of Persons, as such, (i) appointed by the Managers upon the dissolution of the Company in accordance herewith to wind up the affairs and liquidate the assets of the Company and to distribute the net proceeds therefrom or (ii) unless the Managers shall have appointed a Liquidator or itself undertaken to liquidate the Company.

*Losses* means the net losses of the Company for federal income tax purposes (or as may be otherwise required to comply with the Allocation Regulations) determined as of the close of the Company's Fiscal Year and, when the context requires, related items of deduction or loss, tax preference, credits, and depreciation, provided that "Losses" shall include items described in Code Section 705(a)(2)(B) or required by the Treasury Regulations to be treated as so described.

*Majority in Interest of Members* means, as of any date of determination, Members who are entitled to vote and own Units entitled to vote that represent a Percentage Interest of more than 50%, regardless of the Class of such Units.

*Majority in Interest of Members Other Than the Managers* means, as of any date of determination, Members who are entitled to vote and own Units entitled to vote that represent a Percentage Interest of more than 50% of all Units other than the Units held by the Managing Member, regardless of the Class of such Units.

*Managers* means, initially, the following: Markos Lagos and Andrew J. Lynn.

*Member* means the Managers and each Person admitted herewith or hereafter as a Class A Member or a Class B Member. Permitted Assignees of Units who have not been

-5-



admitted as members of the Company in respect of such Units, shall, however, whether or not specified in any particular provision(s), be "Members" in respect of such Units for all purposes of the Act and this Agreement, except insofar as the Act or this Agreement would grant them any governance or voting rights (except as any such governance or voting right may expressly be granted them pursuant hereto). Except as otherwise expressly set forth in this Agreement, for all purposes of the Act and this Agreement, all Members shall constitute a single class or group of members.

*Net Asset Value* means, with respect to any asset (other than cash or equivalents), the amount by which the gross fair market value of such asset as agreed upon at the time of the contribution or distribution thereof by and between the Managers and the Person(s) contributing or being distributed such asset exceeds the value of the total monetary obligations then secured by such asset or otherwise considered assumed by the transferee(s) under Section 752 of the Code at the time of such contribution or distribution. In the case of contributed services, the Net Asset Value shall be equal to the present fair market value thereof as agreed upon by the Managers and the Person(s) contributing such services.

*Percentage Interest* means, with respect to each Member, the Member's Class B Percentage.

*Person* includes any individual, corporation, association, partnership (general or limited), joint venture, trust, estate, limited liability company, or other legal entity, organization, or agency.

*Profits* means the net profits of the Company for federal income tax purposes (or as may otherwise be determined to comply with the Allocation Regulations) determined as of the close of the Company's taxable year, and, when the context requires, related items of income or gain, provided that Profits shall include income exempt from tax.

*Priority Return* means, with respect to each Class A Member, as of any date, an amount equal to 10% per annum, for the actual number of days in the period for which the Priority Return is being determined based on a 365-day year, not compounded, of the average daily balance of the cash Capital Contributions of such Class A Member from time to time, commencing on the first date such Member makes a cash Capital Contribution to the Company to the time of distributions to the Member of amounts distributed pursuant to Section 7.2(a), 7.2(b) or 7.2(e), as applicable. If a Class A Member has guaranteed a debt made to the Company at the request of the Company, the Class A Member shall be entitled to an amount equal to 2% per annum of the amount so guaranteed, for the actual number of days in the period for which the Priority Return is being determined based on a 365-day year, not compounded, of the average daily balance of the amount of such unpaid loan for which such Class A Member is liable.

209540v1

*Property* means any real or personal property owned, operated, or leased by the Company or otherwise used in the conduct of its business.

*Right of Co-Sale* has the meaning given such term in Section 13.10.

*Sale Transaction* has the meaning given such term in Section 13.11.

*Selling Members* has the meaning given such term in Section 13.10.

*Substitute Member* means any Person who, directly or indirectly, acquires ownership of one or more previously issued and outstanding Units pursuant to an assignment thereof permitted hereby and who is admitted to the Company as a Member pursuant to Section 5.3, in respect of the Class of Units as to which he is admitted as such.

*Tax Matters Member* has the meaning set forth in Section 8.2.

*Treasury Regulations* or *Regulations* mean those regulations promulgated by the United States Department of the Treasury under the Code. Whenever reference is made to any Regulation, unless otherwise specified, such reference shall include any amendment(s) or successor regulation(s) thereto.

*Unit or Units* means a Class A Unit or Units and/or a Class B Unit or Units.

    **1.2   Gender and Number.**   Throughout this Agreement, the masculine and neuter genders shall be deemed to include all genders, and the singular, the plural, and vice versa, except if and where such construction would be inconsistent with the clear terms of the provision or unreasonable.

    **1.3   Headings.**   All section, or subsection titles or captions contained in this Agreement are for convenience only and shall neither be deemed part of the text of this Agreement nor in any way be interpreted to limit, amplify, or be part of the terms or provisions hereof.

    **1.4   Certain Words.**   The words "hereof," "herein," "hereunder," and similar compounds of "here" shall mean and refer to this entire Agreement, as amended, and not to any particular section, paragraph, or sentence unless so required by the context. "Include," "including," and similar compounds of "include" shall be deemed to mean without limitation unless expressly stated otherwise.

    **1.5   Cross References.**   Any reference herein to a "Section," "Article" "Schedule," or the like shall be deemed to refer to the specified Section, Article, Schedule, or the like hereof, as the case may be, unless otherwise specified or clear from the context.

209540v1



## ARTICLE II
## NAME, OFFICES, REGISTERED AGENT, TERM, AND CERTAIN FILINGS

**2.1  Term.** The Company was formed and its term commenced with the filing of the Articles with the Department in accordance with the Act. The Company shall have perpetual existence unless and until dissolved pursuant to Article XIV; provided, however, that, upon dissolution of the Company, the existence of the Company as a separate legal entity shall continue until it is wound-up and, thereupon, its Articles cancelled in the manner required by the Act.

**2.2  Name.** The name of the Company is and shall be Plastic 2 Oil of Clearwater 1, LLC. The Company may conduct business under such name or under any similar or other name, to the extent permitted by applicable law.

**2.3  Principal Office and Registered Agent.**

**(a)  Maintenance.** The Company shall have and continuously maintain both a principal office and a registered agent in the State of Delaware as required by the Act.

**(b)  Change.** The Managers may from time to time replace or cause to be replaced the Company's registered agent and/or change or cause to be changed the Company's principal office, in accordance with applicable law. If the Company's registered agent in Delaware resigns as such or changes the location of its office, the Managers shall promptly appoint or cause to be appointed a new registered agent in Delaware if the registered agent has not itself lawfully effected such change.

**(c)  Principal Office.** The Company's principal office shall be at such location as the Managers may from time to time determine. The Managers shall promptly furnish or cause to be furnished each Member notice of any change in the location of the Company's principal office. The failure of the Managers to furnish or cause to be furnished any such notice shall not, however, affect the validity of any action taken by the Managers or the Company at any location, nor subject the Company, the Managers, or any other Person to any liability.

**2.4  Filings.** The Managers may and shall cause the Company to file or record such documents and take such other actions under, pursuant to, in accordance with, or permitted by the laws of Delaware and/or any other jurisdiction the filing or recording of which are required, necessary, or desirable to perfect and maintain the status of the Company as a limited liability company under the laws of the State of Delaware, to effect amendments to the Articles authorized hereby or hereunder, to permit the Company lawfully to do business in Delaware or any other jurisdiction under the name(s) utilized or to be utilized therein, to promote and protect the limitation of

209540v1

liability for the Members in Delaware or any other jurisdiction, and for other purposes not inconsistent herewith or required, necessary, or permitted by the Act.

## ARTICLE III
## PURPOSES, POWERS, AND INVESTMENTS

**3.1   Purposes.**  The objects and purposes of, and the nature of the business to be conducted by the Company shall be to own and operate a plastic to oil facility pursuant to the Licensing Agreement attached hereto as Exhibit A and to engage in any other lawful activities relating thereto; however, no other business shall be carried on by this entity .

**3.2   Powers.**  The Company shall, for purposes of conducting its business, have all the powers of a Delaware limited liability company, including the power to:

> **(a)**    enter into the contracts and joint ventures and otherwise to conduct the business provided for in this Agreement and to purchase, acquire, invest in, own, hold, develop, lease, sublease, license, sublicense, contribute, receive contributions of, operate, maintain, mortgage, pledge, encumber, finance, refinance, sell, convey, assign, transfer, dispose of, exchange, and otherwise deal in and with the Property or any interest therein;

> **(b)**    borrow money, issue evidences of indebtedness in respect thereof, and secure the same by mortgage, pledge, grant of lien, or otherwise;

> **(c)**    refinance, prepay (in whole or in part), recast, modify, renew, extend, and/or restructure any indebtedness of the Company and execute any documents in connection therewith;

> **(d)**    hire, retain, or appoint employees, agents, consultants, employee leasing companies, and advisors of the Company, and define their duties and fix their compensation;

> **(e)**    deposit or invest liquid Company funds, by way of limitation, in one or more demand or time deposit accounts, short-term certificates of deposit, or other short-term obligations of banks, invest such funds in short-term obligations issued or guaranteed by the U.S. Government or any agency thereof, or invest such funds in other highly-rated short-term liquid instruments;

> **(f)**    provided such disposition does not violate or otherwise cause a default under any other agreement to which the Company may be bound, sell or otherwise dispose of all or substantially all the assets of the Company as part of a single transaction or plan; and

–9–

**(g)**     do all things, carry on any activities, and enter into, perform, modify, supplement, or terminate any contracts, leases, agreements, or commitments of any kind so long as such things, activities, and contracts may be lawfully done, carried on, or entered into by the Company under the laws of the State of Delaware, provided not prohibited by this Agreement.

**3.3   Liquid Funds; Title to Property.**

**(a)     Liquid Funds.** Liquid funds of the Company awaiting investment shall be deposited in bank accounts or invested in interest-bearing investments as set forth in Section 3.2(e). Such accounts and investments shall be held in the Company's name. Such funds and investments shall be separately identifiable as belonging to the Company; they shall not be commingled with those of any other Person.

**(b)     Title to Property.**   Subject to Section 3.3(a), title to all of the Company's Property and any other property of the Company shall be held by and in the name of the Company.

**ARTICLE IV**
**OWNERSHIP, UNITS, CONTRIBUTION AGREEMENTS**

**4.1   Ownership; Class A Units; Class B Units.** The   ownership   of   the Company is vested in the owners of the Class A Units and the Class B Units. The Company is authorized to and shall issue Class A Units and Class B Units in return for the Capital Contributions and other considerations, if any, specified in Schedule A hereto. The Company is not authorized to issue additional Units after the date of this Agreement except as provided herein.

**4.2   Voting Rights.** Class A Units shall have no voting authority. Each Class B Member shall have the same number of votes as the number of Class B units owned by such Member and all Class B Members shall be entitled  to vote on any matter with respect to which this Agreement specifically gives Members the right to vote as provided for in Section 9.8. Except as expressly provided in this Agreement, voting rights may not be separated from the economic rights associated with a Unit and shall be suspended in the hands of an Assignee of a Unit unless and until such Person shall become a Member in respect thereof.

**4.3   No Certificates.**   The Units issued by the Company shall not be represented by certificates.

**4.4   Reliance on Ownership Records.**   The Company shall be entitled to recognize the exclusive right of a Person shown in the Company's books and records as a Member or Assignee of Units on the record date to receive distributions, to vote,

-10-

and/or to be treated as the owner for any other ownership-related purpose, as appropriate and permitted hereunder. The Company shall not be bound to recognize any equitable or other claim to or interest in any Unit on the part of any other Person (including any broker, dealer, bank, trust company, or clearing organization which is acting as a nominee, agent, or other representative of another person), whether or not the Company shall have received express or other notice thereof, except as otherwise required by the laws of Delaware or by a guardian, custodian, or conservator for the benefit of a minor or Incapacitated Person, by a trust for the benefit of the trustee or one or more members of the trustee's Immediate Family, or by another fiduciary for like beneficiaries.

**4.5   Units as Personalty.** The Units shall be deemed personal property for all purposes. They shall not be deemed to provide any interest in any or all of the Company's Property.

**ARTICLE V**
**MEMBERS**

**5.1   Current Members.** The Class A Members and the Class B Members on the date of this Agreement, the number of Class A Units and Class B Units owned by them and their Capital Contributions through the date of this Agreement are listed on **Schedule A**. Each such Person is a Class A Member or Class B Member with respect to the indicated number of Class A Units or Class B Units on **Schedule A** as of the Effective Date of this Agreement. By his execution of this Agreement, each such Member has acknowledged that he is a Class A Member with respect to the indicated Class A Units and that he is a Class B Member with respect to the indicated Class B Units and has agreed to comply with the terms and conditions of membership in the Company as set forth herein. From and after the date of this Agreement, the ownership of Units shall be as reflected on **Schedule A**, as amended from time to time by approval of the Managers and the Class B Members.

**5.2   Substitute Members.** Notwithstanding any other provision of this Agreement, no Assignee of any Unit(s) shall be admitted as a Substitute Member with respect thereto unless and until (a) the assignment is made in accordance with Article XIII, (b) the Managers shall have approved the admission of the Assignee as a Substitute Member (and not just the sale, transfer, or other assignment, if approval thereof is required), (c) the Assignee shall have delivered to the Company a copy of an executed and acknowledged written instrument of assignment and/or such other instrument(s) as the Company may deem necessary or desirable to validate the assignment, (d) the Assignee assents to and executes this Agreement (provided, however, that an Assignee then already a Member shall be deemed to have done so with respect to the additional Unit(s) in question by virtue of his prior assent to and execution of this Agreement), (e) the Assignee delivers to the Company such other documents the Company may require, and (g) the Assignee pays the Company for all

-11-

expenses reasonably incurred by the Company in connection with admission of the Assignee to the Company as a Substitute Member of the applicable Class with respect to such Unit(s).  Any act by the Company, the Managing Member, an officer of the Company, a Member, or an Assignee to confer or provide Substitute Member status with respect to any outstanding or previously outstanding Unit(s), or to reflect Substitute Member status with respect to any outstanding or previously outstanding Unit(s) in the Company's books, shall automatically include the condition that any Person becoming a Substitute Member with respect to such Unit(s) first assent to and execute this Agreement, except as provided otherwise in this Agreement.  If admitted, a Substitute Member shall have all the rights and powers and be subject to all the restrictions and liabilities of the preceding owner(s) of such Unit(s) of a particular Class with respect thereto.  The admission of a Substitute Member shall not, however, relieve the Person assigning the Unit(s) from any liability such Person may have had to the Company in respect of the assigned Unit(s) (or otherwise) prior to the assignment.

    **5.3  Resignation.**  No Member shall have the right to resign or withdraw without a unanimous vote of the Members who hold voting rights.

    **5.4  Powers.**  Members shall have no voting rights except as expressly granted to such Members by this Agreement.  No Member, in his capacity as such, other than the Managing Member, shall, in his capacity as such, be an agent, possess the right or power to act on behalf of, represent that he may act on behalf of, or bind or pledge the credit of the Company, or otherwise render the Company monetarily liable for any purpose, and any Member who, in his capacity as such, exceeds such limitation shall be liable to the Company for any damages proximately or consequentially sustained by the Company as a result.

    **5.5  Relationship of Members.**  Nothing in this Agreement shall render any Member liable for any debts or obligations of or incurred by any other Member, constitute any Member an agent or partner of or authorize a Member to bind or act for any other Member(s), create or confer any interest on the part of any Member in the business or assets of any other Member(s), or cause any Member to assume any obligation from or on behalf of any other Member(s).  To the extent any Member by word or action represents to another Person that he and any other Member(s) are partners with respect to the Company or that the Company is a partnership, the Member making such wrongful misrepresentation shall indemnify and hold harmless any other Member who incurs personal liability by reason of such wrongful misrepresentation.

    **5.6  Partition.**  Each Member waives, until dissolution of the Company, any and all rights he may have to maintain an action for partition of the Company's property.

209540v1

**5.7 Representations and Warranties.** Each Member hereby represents and warrants to the Company, as of the date on which he or she executed the Agreement and/or otherwise became bound by it, that:

(a)     if the Member is a corporation or limited liability company, it is duly organized, validly existing, and (if applicable) in good standing under the laws of the state of its incorporation, formation, or organization, as the case may be, and, if required, is duly qualified to do business and in good standing as a foreign corporation or foreign limited liability company in the jurisdiction of its principal place of business (if not in its state of incorporation. formation, or organization) and/or Delaware;

(b)     if the Member is an Entity other than a corporation or limited liability company, (i) it is duly formed, validly existing, and (if applicable) in good standing under the laws of its state of formation, (ii) if required by law, it is duly qualified to do business and in good standing in the jurisdiction of its principal place of business (if not in its state of formation) and/or Delaware, and (iii) the representations in Sections 5.8(a) and (b), insofar as applicable, are, to the best of its knowledge, true and correct with respect to each general partner, trustee, or other member of the Member;

(c)     if applicable, the Member has full power and authority to execute and enter into this Agreement and to perform its obligations hereunder and all necessary actions by its board of directors, shareholders, officers, managers, members, partners, trustees, beneficiaries, or other Person(s) necessary for the due authorization, execution, delivery, and performance of this Agreement by such Member have been duly taken;

(d)     the Member has duly executed this Agreement; and

(e)     the Member's authorization, execution, delivery, and performance of this Agreement neither conflicts with any other agreement or arrangement to which such Member is a party or by which such Member is bound nor requires any approval, consent, or the like of any governmental authority not duly obtained.

**5.8 Compensation of Members.** The Company shall not compensate or reimburse any Member for services, activities, or expenses undertaken, paid, or incurred in his capacity as a Member, except as otherwise expressly provided herein.

**5.9 Other Ventures.** Notwithstanding any other provision of this Agreement, but subject to any separate agreement by a Member, one or more Members, independently or with or for others, directly or indirectly, now or in the future, may engage in other business activities and/or possess interests in other business ventures of

-13-



eFiling for Case Number: 13-003971-CI

every nature and description, whether similar or dissimilar to the business of or in competition with the Company, and neither the Company nor the Members, or any of them, shall have any right by virtue of the Act, the Articles, or this Agreement in or to such independent activities or ventures or to the income or profits derived therefrom. Further, no Member or Affiliate of any Member shall, by virtue of such status, be obligated under the Act, the Articles, or this Agreement to present any particular business or investment opportunity to the Company.

## ARTICLE VI
## CONTRIBUTIONS AND TRANSACTIONS
## WITH MEMBERS AND OTHERS

**6.1   Capital Contributions for Units.**  The amount of and terms upon which Capital Contributions for Units may be issued by the Company shall be as follows:. Each Class A Member listed on **Schedule A** has contributed cash to the capital of the Company in the amount set forth as such Member's Capital Contribution on **Schedule A** or has agreed to guaranty, jointly and severally, a loan to the Company in an amount not to exceed $525,000. Each Class B Member listed on **Schedule A** has contributed cash to the capital of the Company in the amount set forth as such Member's Capital Contribution on **Schedule A**

**6.2   Additional Contributions.**  Except as specifically provided in or pursuant to a Contribution Agreement:

    **(a)**   no Person shall have the right to make any, or any further, Capital Contributions or to obtain additional Units except as provided in Section 4.6 regarding preemptive rights;

    **(b)**   the Company may not accept additional Capital Contributions; and

    **(c)**   the Company has no right to require any Person to make additional Capital Contributions, in any form, whether to restore a deficit or negative balance in his Capital Account or for any other purpose at any time.

**6.3   No Interest on Capital Contributions.**  No interest shall be paid by the Company on or with respect to any Capital Contribution.

**6.4   Priority.**   There shall exist no priority to the return of any Capital Contribution or as to allocations or distributions by the Company, except as specifically provided otherwise in this Agreement.

**6.5   No Withdrawal.**  No Member shall have the right to withdraw or demand the return of all or any part of his Capital Contribution or Capital Account, except as such return is required by law or expressly provided for elsewhere herein.

-14-

209540v1

**6.6   Loans and Other Transactions with Members, the Managing Member, and Their Affiliates.**

     **(a)   Engagement of Manager.**   The Company shall engage an operating manager to provide managerial services for a monthly fee equal to 5% of the monthly gross income of the company for. The monthly fee shall be paid on the 15th day of each month. The initial operating manager shall be **ES Resources, LLC,** a Member hereof, which shall continue to serve in such capacity so long as said Member is not in violation of any obligation arising hereunder and so long as no violation of the License Agreement between the Company, as Licensee, and JBI, Inc, Licensor, has been asserted to have occurred. **It is acknowledged that Plastic2Oil Land, Inc., a Class B Member hereof, is a subsidiary of JBI, Inc.**

     **(b)   Permissibility.** Except for Class A Members, the operating manager, Class B Members and Affiliates thereof, and the Managers may, but shall be under no obligation to, lend or advance money to, act as surety for, pay or assume the obligations or liabilities of, or otherwise transact business with the Company with the same rights and obligations as a person not a Member, Managing Member, or Affiliate of a Member or the Managing Member. Further, no contract or other transaction between the Company and any Member, or Affiliate of any Member, shall be either void or voidable because such Person is a Member, or Affiliate of a Member, if the transaction is not unfair to the Company in that a fully independent third party might reasonably have entered into the contract or transaction with the Member, Manager, or Affiliate of the Member or Manager on substantially the same terms and conditions.

     **(c)   Contracts.** The company is specifically authorized to enter into contracts to acquire the equipment required to commence operations of the plastic to oil business from a party affiliated with a Member or Manager, to enter into a license agreement to enable it to utilize the technology described therein with an entity affiliated with a Member or Manager provided only that the terms of such contracts is more favorable to the Company or otherwise consistent with the terms offered to others.

     **6.7   No Requirement to Guaranty Company Debt.** No Member or Affiliate of a Member, except as may be applicable to a Class A Member, is obligated to guaranty Company debt.

**ARTICLE VII**
**DISTRIBUTIONS OF CASH AND ALLOCATIONS**
**OF PROFIT AND LOSS**

     **7.1   Distributions Generally.**   The Company shall make quarterly distributions of Excess Cash Flow.

-15-

209540v1



**7.2   Amounts and Priority of Distributions.**   Quarterly distributions of Excess Cash Flow, except as otherwise provided in Article XIV with respect to liquidating distributions, shall be made in the following order and preference:

(a)   *first,* to the Class A Members, in proportion to their respective Class A Percentages, until each Class A Member has received an aggregate amount for the particular Fiscal Year which, when combined with the distributions previously made to such Class A Member under this Section 7.2(a), during the particular Fiscal Year is equal to the Class A Member's Priority Return for the particular Fiscal Year. Any Priority Return not paid for a particular year shall accumulate and be added to the amount of preference to which Class A members are entitled in subsequent years;

(b)   *second,* to the Class B Members in proportion to their respective Percentage Interests.

(c)   Upon the vote of the majority of Class B Members, the Class A Members may be redeemed in whole or in part at any time. Upon such redemption, the amount so redeemed shall cease to be entitled to the payment of a Priority Return and the Class A Membership interest shall be cancelled to the extent so redeemed. In the event any or all of the debt guaranteed by a Class A Member is repaid or the lender releases the Class A Member's liability as a guarantor of debt of the Company, the Class A Member shall cease to be entitled to any Priority Return as to such repaid debt or guaranty reduction.

**7.3   Restrictions on Distributions.**

(a)   **Solvency Requirement.**   The Company shall not make any distributions unless the Manager determines that, immediately after giving effect thereto the Company is not insolvent within the meaning of the Act.

(b)   **Other Agreements.**   The Company shall not make any distributions in violation of any restrictions with respect thereto under the terms of any notes, or other obligations it may issue, agree to, or assume in connection with borrowed funds or otherwise.

(c)   **Limited Liability for Return of Distributions.**   No Member shall be liable to the Company for the amount of a distribution received in violation of Section 7.2 if such Member did not know of such violation. A Member who receives a distribution in violation of Section 7.2 knowing of such violation shall be liable to the Company, upon demand made within three years after the date of the distribution, for the amount of the distribution up to the amount by which the Managers determines the aggregate distributions to Members of which such

-16-

eFiling for Case Number: 13-003971-CI

distribution was a part exceeded the aggregate amount of distributions permissible under Section 7.2.

**7.4   Re-distribution among Members.**   Nothing contained herein shall prevent a Member and a Substitute Member or Assignee to whom a Member assigns his Unit(s) in accordance herewith from agreeing between themselves to re-distribute any distributions made by the Company.

**7.5   Amounts Withheld.**   Any tax withheld by the Company from a Member pursuant to the Code or any provision(s) of other federal, state, or local tax law with respect to any payment or distribution to a Member shall, upon remittance to the appropriate tax authority, be treated as amounts distributed.

**7.6   Capital Accounts.**

**(a)   General.**   A separate Capital Account shall be established, determined, and maintained for each Member's Class A Units and Class B Units in accordance with the provisions of the Treasury Regulations governing the determination and maintenance of partnership capital accounts.   Upon an assignment of all or a part of a Member's Unit(s) of a particular Class, the Capital Account of the assignor for that Class will, insofar as appropriate, carry over to the assignee; provided that, if such assignment causes a termination of the Company under Section 708(b)(1)(B) of the Code, the Capital Account that carries over will be appropriately adjusted to reflect the liquidating distribution and the contributions deemed to have occurred under Section 1.708-1(b)(1)(iv) of the Treasury Regulations.   Except as required by the Treasury Regulations, any Member with respect to whom a Company election to make an optional adjustment to the basis of Company property under Sections 734 and 743 of the Code is in effect (as a result of an election under Section 754 of the Code) shall not have a corresponding adjustment made to his Capital Account, and any adjustments to his Capital Account by reason of distributions, depreciation, depletion, amortization, gain, or loss with respect to such property will disregard such basis adjustment.

**(b)   Increases and Decreases; General.**   Each Member's Capital Account with respect to each Class shall be:

(i)   increased by:

(A)   the amount of money contributed to the Company as a Capital Contribution attributable to the applicable Class;

(B)   the Net Asset Value of any capital contributions of property attributable to the applicable Class; and

-17-



eFiling for Case Number: 13-003971-CI

(C)    such Member's distributive share of Profits (or items thereof)attributable to the applicable Class; and (ii) decreased by:

(A)    such Member's distributive share of Losses (or items thereof) attributable to the applicable Class;

(B)    the amount of money distributed by the Company to such Member attributable to the applicable Class; and

(C)    the Net Asset Value of any property distributed by the Company to such Member attributable to the applicable Class.

(c)    **Revaluation of Company Property.**  The property of the Company shall be revalued on the books of the Company in any case in which such revaluation is required by the Treasury Regulations and may be revalued in any case where such revaluation is permitted by the Treasury Regulations and such revaluation is determined to be appropriate by the Managing Member. In the event any Company property is revalued on the books of the Company in accordance with the Treasury Regulations, Members' Capital Accounts shall be adjusted in accordance with the Treasury Regulations to reflect such revaluation and for allocations to such Capital Accounts of Profits and Losses, and items thereof, as computed for book purposes, with respect to such property. In the event the Company's property is revalued on the books of the Company, all such property shall be valued for such purpose at its fair market value, as determined by the Managing Member

(d)    **Compliance.** The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with the Treasury Regulations governing the determination and maintenance of partnership capital accounts, and shall be interpreted and applied in a manner consistent with such Regulations. If any of the provisions of this Agreement relating directly or indirectly to Capital Account determination and maintenance at any time conflict with such Regulations, such Regulations shall govern Capital Account determination and maintenance.

**7.7  General Rules for Allocation.**  Except as otherwise provided in this Article VII, for purposes of determining Members' Capital Accounts and distributive shares for federal income tax purposes, income, gain, loss, and deductions (and items of each of the foregoing, including income exempt from federal income taxation) shall be allocated in the manner provided in this Section 7.6.

(a)    **Profits.** After giving effect to the special allocations in subsections (c), (d) and (e) below, Profits shall be allocated each Fiscal Year as follows:

-18-



eFiling for Case Number: 13-003971-CI

(i) *first,* to the Members in proportion to the aggregate Losses allocated to them pursuant to Section 7.7(b) hereof for all prior years, in an amount equal to the excess, if any, of (A) the aggregate Losses allocated to Members pursuant to Section 7.7(b) hereof for all prior years, over (B) the sum of the aggregate Profits allocated to the Members pursuant to this Section 7.7(a)(i) for all prior years;

(ii) *second,* to the Class A Members, in proportion to their receipt of distributions pursuant to Section 7.2(a), in an amount equal to the excess, if any, of (A) the aggregate distributions to Class A Members pursuant to Section 7.2(a) from the commencement of the Company to the end of such Fiscal Year, over (B) the aggregate Profits allocated to the Class A Members pursuant to this Section 7.7(a)(ii) for all prior Fiscal Years;

(iii) *third,* to the Class B Members, in proportion to their receipt of distributions pursuant to Section 7.2(b), in an amount equal to the excess, if any, of (A) the aggregate distributions to Class B Members pursuant to Section 7.2(b) from the commencement of the Company to the end of such Fiscal Year, over (B) the aggregate Profits allocated to the Class B Members pursuant to this Section 7.7(a)(iii) for all prior Fiscal Years; and *thereafter,* to the Members in accordance with each Member's respective Percentage Interest.

**(b)** **Losses.** After giving effect to the special allocations in subsections (c), (d) and (e) below, Losses shall be allocated each Fiscal Year as follows:

(i) *first,* to the Members in proportion to their respective Capital Contributions in an amount equal to the excess, if any, of (A) its aggregate cash Capital Contributions, over (B) the aggregate Losses allocated to the Members pursuant to this Section 7.7(b)(i) for all prior years;

(ii) *second,* to the Members in proportion to their respective Capital Account balances, until their respective Capital Accounts are reduced to zero; and

(iii) *thereafter,* to the Members in accordance with each Member's respective Percentage Interest

**(c)** **Section 754 Adjustments.** To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(m) to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis), and such gain or loss shall be specially allocated to the

209540v1

Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such section of the Treasury Regulations.

   **(d)**   **704(c) of the Code.**  Notwithstanding the foregoing, (i) if Code Section 704(c), or Code Section 704(c) principles applicable under Treasury Regulations promulgated under Section 704(b) of the Code, require allocations of Profits or Losses in a manner different than set forth above, the provisions of Code Section 704(c) and the applicable Treasury Regulations promulgated under Code Section 704(c) shall control such allocations.  Allocations pursuant to Code Section 704(c) shall be made for tax purposes only and shall not affect any Member's Capital Account.

   **(e)**   **Regulatory Allocations.**  The Members intend that the allocations hereunder comply with the Allocation Regulations so that the allocations made hereunder will be deemed to have "substantial economic effect" as provided herein.  To the extent special allocations of Profits or Losses are required to be made to comply with the requirements thereof which are not otherwise provided for herein, such special allocations shall be made in the manner set forth in the Code and Regulations, as determined in good faith by the Managing Member.  To the extent any such special allocations are made, subsequent allocations of Profits and Losses shall be made to offset any economic distortion caused by such special allocations, as determined by the Managing Member.

## ARTICLE VIII
## TAX MATTERS

   **8.1   Tax Status.**  It is intended that the Company be treated as a partnership for federal and state income tax purposes (but not for non-tax purposes).  The Members shall take all actions, and execute, acknowledge, and deliver all documents, which in the judgment of the Managing Member, or in the opinion of counsel satisfactory to the Managing Member, are necessary or desirable to obtain and maintain the Company's classification as a partnership for such purposes at all times.

   **8.2   Tax Matters Member.**

   **(a)**   The Managers shall designate the Company's initial "Tax Matters Member" for purposes of Code Section 6231(a)(7) and shall have the power to manage and control, on behalf of the Company, any administrative proceeding at the Company level with the IRS relating to the determination of any item of Company income, gain, loss, deduction, or credit for federal income tax purposes.

   **(b)**   The Tax Matters Member shall, within ten days of the receipt of any notice from the IRS in any administrative proceeding at the Company level

-20-

209540v1

relating to the determination of any Company item of income, gain, loss, deduction, or credit, mail a copy of such notice to each Member.

(c)     In the event of an audit, the Tax Matters Member may retain legal counsel, accountants, and other professionals to assist it in the audit.   The Company shall indemnify and reimburse the Tax Matters Member for all expenses, including legal and accounting fees, claims, losses, liabilities, and damages incurred in connection with any tax audit or judicial review with respect to the tax liability of Members as such.   The incurrence of expenses by the Tax Matters Member shall be in the sole discretion of the Tax Matters Member.

(d)     If the Tax Matters Member should resign as such (which it shall be permitted to do by furnishing notice to the Managers, effective as specified therein or otherwise upon the effective date of such notice), cease to be a Member or affiliate thereof, or otherwise materially fail or cease to perform as the Tax Matters Member, the Managers may appoint a replacement Tax Matters Member.

## ARTICLE IX
## ACTIONS OF MEMBERS

**9.1   Voting Power; Meetings.**   References in this Agreement to voting power include the voting power of the Managers and the Class B Members as provided for in Section 9.8.   Meetings of the Members may be called for any specified purpose(s) by the Managers or by notice signed by Members owning or holding a majority of the voting power entitled to be voted on the matter(s) for which notice is given.   Members shall transact only such business at a meeting as is either expressly set forth in the notice(s) therefor or closely incidental thereto.   Regardless of who calls a meeting of the Members, Class B Members are entitled to vote only upon matters upon which this Agreement specifically provides for a vote of the Members.

**9.2   Place of Meetings.**   Meetings of Members shall be held at the place within or outside the State of Delaware designated in the notice of the meeting by the Managers or, in the event a meeting is called by the Members, by such Members (but if called by the Members, subject to relocation by the Managers upon notice).   If no designation is made, the place of meeting shall be the principal place of business of the Company (but if the meeting is called by the Members, subject to relocation by the Managers upon further notice).

**9.3   Notice of Meetings.**   Except as provided in Section 9.4, a notice stating the place, day, and hour of a meeting of the Members and the purpose or purposes for which the meeting is called shall be furnished not less than ten nor more than sixty days before the date of the meeting, by or at the direction of the Managers or the Member(s) calling the meeting.   Notices of meetings of Members shall be furnished to each Member of record.

-21-

209540v1

**9.4   Meeting of All Members.**  Regardless where or when, if all the Members entitled to vote on an action meet regarding such action consent to the holding of the meeting at such time and place, such meeting shall be valid without call or notice, and lawful action may be taken with respect to such action at such meeting.

**9.5   Record Dates.**  Except as may be otherwise provided herein, for the purpose of determining Members entitled to notice of and to vote at any meeting of Members or any adjournment thereof, or Members or other Persons entitled to receive any distribution, or in order to make a determination of Members or other Persons for any other purpose, the date on which notice of the meeting is mailed or, with respect to entitlement to a distribution, the date on which the resolution declaring such distribution adopted, shall be the record date for such determination of Members or other Persons, unless the Managers shall prior thereto have fixed in advance a record date that shall not be less than ten nor more than sixty days prior to the date of such meeting or other action.  When a determination of Members entitled to vote at any meeting of Members has been made as provided in this Section 9.5, such determination shall apply to any adjournment thereof; provided, however, that the Managers may fix a new record date for any adjourned meeting and further provided that the adjournment(s) of any such meeting shall not exceed thirty days in the aggregate or a new record date shall be fixed.

**9.6   Conduct of Meetings.**  Meetings of the Members shall be conducted by the person designated by the Managers as the Chairman of the meeting. In the absence of any such designation or the presence of the person designated to conduct the meeting, by a person selected upon a vote of the Members present. The Managers shall be entitled to attend all meetings of the Members.

**9.7   Quorum.**  A majority of the voting power of the Company represented in person or by proxy shall constitute a quorum for purposes of a meeting of the Members with respect to such action.  If a quorum is present at any time during a duly called or held meeting, the Members present may take up an action and otherwise continue to transact business at the meeting until adjournment, even though withdrawal of one or more Members earlier present has left less than the proportion otherwise required for a quorum.   In the absence of a quorum at a meeting of the Members, Members representing a majority of the voting power present in person or by proxy at the meeting may adjourn the meeting from time to time for a period not to exceed thirty days, without further notice.  However, if the adjournment is for more than thirty days or, if after the adjournment a new record date is fixed for the adjourned meeting, notice of the adjourned meeting shall be given.

**9.8   Voting.**  With respect to all matters upon which the Members are entitled to vote or give their approval or consent, the voting power of the Company is as follows: each Unit shall have one (1) vote and Members shall vote in accordance with their respect Percentage Interests. Unless otherwise specifically provided for in this

Agreement, whenever the Members are required to take action, approve or consent to a matter, the Members shall take action or provide their approval or consent therefor by the affirmative vote of the Members with a majority of the Company's voting power. Voting shall be by ballot on any question as to which a ballot vote is demanded by any Member or representative of a Member entitled to vote; otherwise, a voice vote shall suffice.

**9.9   Proxies.**  At all meetings of the Members, and any adjournments thereof, a Member may vote in person or by written proxy executed in writing by the Member or by his or her duly authorized attorney-in-fact.  (For purposes of this Section 9.9, an email transmission by the Member or a photographic, facsimile, or similar reproduction of a writing executed by the Member shall be deemed "written.")  Any such proxy shall be filed with the Managers or person conducting the meeting before or at the time of the meeting.  A proxy shall be revocable unless it conspicuously states that it is irrevocable and coupled with an interest.  No proxy shall be valid after ninety days after the date of its execution, unless otherwise provided in the proxy.  The burden of proving the validity of any undated, irrevocable, or otherwise contested proxy shall rest with the Person seeking to exercise the same.  If a proxy designates two or more Persons to act as proxies, unless the proxy provides to the contrary, a majority in number of such Persons present at any meeting at which the proxy is to be executed shall have and may exercise all the powers of voting or the provision of  consents thereby conferred, provided that the Company shall not be required to recognize such proxy with respect to an issue covered thereby if there is a deadlock among such Persons and the proxy does not specify how the proxy is to be voted.  If a Member votes by proxy without designating the proportion of his voting rights to be voted a particular way, the Member shall be deemed to have voted all his voting rights that way.

**9.10   Action by Members without a Meeting.**  Action required or permitted to be taken at a meeting of the Members may be taken without a meeting, without prior notice or a vote, if the action is evidenced by one or more written consents (i) describing the action taken, (ii) signed, without written revocation of their signatures delivered to the Managers, by Members entitled to vote on such action having the voting power required by this Agreement to take or approve the action at a meeting at which all the Members entitled to vote on the action were present and voted in favor of or against the action, and (iii) promptly delivered to the Managers for inclusion in the minutes and filing with the Company records.  Action taken pursuant to this Section 9.10 shall be effective when the Company receives the properly signed consent, unless the consent specifies a subsequent effective date.  Every signature must bear a date to be valid.  The record date for determining Members entitled to take action without a meeting shall be the date the consent is delivered to the Managers for filing with the Company records.  No consent shall be valid unless it is dated within sixty days of such record date.  The Company shall promptly upon receipt of any such effective consent

-23-

furnish each non-signing Member a copy of any such consent, but the failure to do so shall not subject the Company, the Managers or any other Person to any liability.

**9.11 Waiver of Notice.** When any notice is required to be given to any Member, a waiver thereof in writing signed by the Member or a duly authorized representative thereof, whether before, at, or after the time stated therein, shall be equivalent to the giving of such notice. Attendance by a Member at a meeting shall constitute waiver of a notice of that meeting by such Member, unless the Member objects at the beginning of the meeting to the transaction of business because the meeting is not lawfully called or convened and thereafter does not remain present at the meeting. A Member in attendance at a special meeting or other meeting as to an action for which special notice is required waives any right to object to the consideration of a particular matter at such meeting on the basis that it was neither described in the notice of the meeting nor is closely incidental thereto unless the Member objects to consideration of the matter promptly upon its presentation and refrains from further consideration of such matter.

**9.12 Participation by Electronic Communications.** A Member may participate in a meeting of Members by any means of communication through which the Member, other Members so participating, and all Members physically present at the meeting may simultaneously hear each other during the meeting. A Member so participating shall be deemed present in person at the meeting.

**9.13 Company Actions Requiring Managers and Member Approval.** The following actions of the Company shall require approval of the Managers and a Majority Vote of the Members, and all other actions of the Company shall be determined solely by the Managers:

(a)     the sale, transfer, exchange or other disposition of all or substantially all of the Company's assets as part of a single transaction or plan;

(b)     the merger or consolidation of the Company into one or more other parties;

(c)     borrowing funds in excess of $1.00 in principal amount, making loans to any person or providing a guaranty of the Company for the obligations of any person;

(d)     the purchase of any asset for more than $1,000; or,

(e)     the liquidation of the Company.

-24-

## ARTICLE X
## MANAGING MEMBER; OFFICERS

**10.1 Managers; Management of Company.** Except for actions as to which the approval of the Members is required by this Agreement and for actions within the authority of the Tax Matters Member, the business and affairs of the Company shall be managed exclusively by or under the supervision and direction of the Managers. The Managers may, consistent with the purposes of the Company, and subject to the restrictions set forth in Section 10.2, exercise all powers of the Company.

**10.2 Restrictions.** Neither the Managers nor any officer, employee, or other agent of the Company directly or indirectly appointed or employed by the Managers shall have authority to: (a) do any act in contravention of this Agreement; or (b) do, without the requisite approval, consent, or authorization, any act that this Agreement requires to be approved, consented to, or authorized by the Members.

**10.3 Discontinuance of Authority and Duties of Managing Member.** The initial Managers shall continue to serve in such capacity until their resignation or their replacement by majority vote of the Class B Members. The authority and duties of a Managers under this Agreement may be discontinued (in whole and not in part) at any time following the occurrence of a Cause Event (after giving effect to all notice requirements, cure periods and cure rights contemplated by the definition of Cause Event) by the affirmative vote of a Majority of the Class B Members. Any such discontinuance shall not constitute the withdrawal of the Manager as a Member or eliminate the Managers ownership of Units in the Company. In the event that the Managers duties and authority are discontinued in accordance with this Section 10.3: (i) the Manager shall cease to have any management rights, powers, obligations or duties provided to the Managers hereunder and under applicable law after the date of the delivery of such notice; (ii) the Members shall, by vote of a Majority of Class B Members appoint, another Person or Persons to perform the Manager's duties hereunder; and, (iii) the removed Manager's ownership interest in the Company and voting rights, if any, shall continue and shall be unaffected by such discontinuance.

**10.4 Officers.**

    (a)    **Designation.** The Managers may, from time to time, designate one or more Persons to be officers of the Company. An officer need not be a Member. Any officer so designated shall have such authority and perform such duties as the Managers may, from time to time, delegate to such officer. The Managers may assign titles (including president, vice president, secretary, and treasurer) to any such officer. Unless the Managers decide otherwise, if the title is one commonly used for officers of a business corporation formed under the Delaware Business Corporation Act, the assignment of such title shall constitute the delegation to such officer of the authority and duties that are normally

-25-

and dispatch to the Members of all checks, reports, and notices and any other documents necessary or desirable in connection with the business and administration of the Company, (g) all costs and expenses incurred as a result of termination of the Company and the distribution, realization or disposal of assets, (h) all costs and expenses of any threatened or actual litigation involving the Company and the amount of any judgment or settlement paid in connection therewith, excluding however the costs and expenses of any litigation, judgment or settlement with respect to which a Covered Person is not entitled to indemnity pursuant to Article XI; and (i) all other costs incurred in connection with the administration of the Company, including but not limited to the License Fee paid or payable to JBI, Inc. or otherwise that may be authorized by this Agreement

**10.7 Payment of Managers' Expenses.** The Managers shall cause the Company to pay the following expenses: (a) the compensation of all of its employees and payroll taxes relating thereto; (b) its respective rent and general office overhead, including clerical, bookkeeping and administrative costs, office supplies, its office equipment expenses and other like expenses; and (c) all its travel expenses.

## ARTICLE XI
## LIABILITY, INDEMNIFICATION, AND EXCULPATION

### 11.1 Limitations on and Exculpation from Liability.

(a)     **Company Debts; Covered Persons.** The debts, obligations, and liabilities of the Company, whether arising in contract, tort, or otherwise, shall be solely the debts, obligations, and liabilities of the Company and no Covered Person shall be obligated personally for any such debt, obligation, or liability of the Company solely by reason of being a Covered Person.

(b)     **Members.** Except as otherwise expressly agreed or required by law, no Member, as such, shall have any liability to or with respect to the Company in excess of (i) the amount of said Member's Capital Contribution, (ii) said Member's share of any assets and undistributed profits of the Company, and (iii) the amount of any distributions wrongfully distributed to said Member.

(c)     **Good Faith Acts and Omissions of Covered Persons.** No Covered Person shall be liable to the Company or any other Covered Person for any loss, damage, claim, or expense incurred by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of authority conferred on such Covered Person by or pursuant to this Agreement, except that a Covered Person shall be liable for any such loss, damage, claim, or expense incurred by reason of such Covered Person's gross negligence, recklessness, fraud, or wanton or willful misconduct.

-27-

209540v1

(d)   **Reliance on Company Records and Other Information.**   A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports, or statements presented to the Company by any Person as to matters the Covered Person reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports, or statements as to the value and amount of the assets, liabilities, profits, losses, or any other facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid.

(e)   **Scope of Duties; Standards of Liability.**   To the extent that, at law or in equity, a Covered Person has duties (including fiduciary duties) and liabilities relating thereto to the Company or to any other Covered Person, a Covered Person acting under this Agreement shall not be liable to the Company or to any other Covered Person for its good faith reliance on the provisions of this Agreement. The provisions of this Agreement, to the extent that they restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the parties hereto to replace such other duties and liabilities of such Covered Person.

(f)   **Resolution of Conflicts; Protection Therefor.**   Unless otherwise expressly provided herein, (i) whenever a conflict of interest exists or arises between a Covered Person and the Company or any Member, or (ii) whenever this Agreement or any law, rule, or regulation, or principle of law or equity provides or commands that a Covered Person shall act in a manner that is, or provides terms that are, fair and reasonable to the Company or any Member, the Covered Person shall resolve such conflict of interest in good faith, taking such action or providing such terms as he shall determine to be fair and reasonable, considering the interests of each party (including its own interest) to such conflict, agreement, transaction, or situation and the benefits and burdens relating to such interests, any customary or accepted industry practices, and any applicable generally accepted accounting practices or principles. In the absence of bad faith by the Covered Person, the resolution, action, or terms so made, taken, or provided by the Covered Person shall not constitute a breach of this Agreement or of any duty or obligation of the Covered Person at law or in equity or otherwise.

**11.2  Indemnification.**

(a)   **Right to Indemnification.**   To the fullest extent permitted by applicable law, the Company shall indemnify and hold harmless a Covered Person from and against loss, damage, claim, or expense incurred by such Covered Person by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably

-28-

believed to be within the scope of authority conferred on such Covered Person by this Agreement, except that no Covered Person shall be entitled to be indemnified by the Company in respect of any loss, damage, claim, or expense incurred by such Covered Person by reason of gross negligence, fraud, or wanton or willful misconduct with respect to such acts or omissions; provided, however, that any indemnity under this Section 11.2 shall be provided out of and to the extent of Company assets only, and no Covered Person shall have any personal liability to provide indemnification on account thereof.

    **(b)**    **Advances.** The right to indemnification conferred pursuant to this Section 11.2 shall include the right to be paid or reimbursed by the Company for reasonable expenses incurred by a Covered Person indemnified hereunder who was, is, or is threatened to be made or named a party to or otherwise involved in a claim, demand, action, suit, or proceeding in advance of the final disposition thereof and without any determination of the Covered Person's final entitlement to indemnification, if:

    (i)    the Covered Person furnishes the Company written affirmation of his good faith belief that he is not excepted from indemnification pursuant to this Section 11.2;

    (ii)    the Covered Person furnishes the Company a written undertaking (which shall be an unlimited general obligation but which need not be secured and may be accepted without reference to financial ability to repay), executed by him, to repay the advance if it is ultimately determined that he did not qualify for indemnification; and

    (iii)    it is determined pursuant to this Section 11.2 that, based upon the facts then known, indemnification of the Covered Person is not excepted from indemnification pursuant to this Section 11.2.

    **(c)**    **Determination and Authorization.** Except with respect to instances where a Covered Person is conclusively presumed entitled to indemnification pursuant to the terms of this Section 11.2, the Managers shall determine in good faith whether a Covered Person is entitled to indemnification or an advance under this Section 11.2 promptly following demand therefor or claim thereof by a Covered Person. The termination of a proceeding by judgment, order, settlement, conviction, plea of *nolo contendere*, or its equivalent shall not, of itself, be determinative or create a presumption that a Covered Person is excepted from indemnification.

    **(d)**    **Conclusive Right to Indemnification.** A Covered Person wholly successful, on the merits or otherwise, in the defense of any claim, demand,

-29-

eFiling for Case Number: 13-003971-CI

action, suit, or other proceeding against him shall be conclusively presumed entitled to indemnification.

(e)     **Survival.** Indemnification under this Section 11.2 shall continue as to a Covered Person who has ceased to serve in the capacity that initially entitled such Covered Person to indemnity hereunder. Further, the rights granted pursuant to this Section 11.2 shall be deemed contract rights, and no amendment, modification, or repeal of this Section 11.2 shall have the effect of limiting or denying any such right with respect to actions taken or omitted to be taken or claims, demands, actions, suits, or proceedings arising prior to any such amendment, modification, or repeal. Such rights shall also survive the dissolution of the Company and the death, incapacity, dissolution, or Bankruptcy of the Covered Person.

(f)     **Non-exclusivity of Rights.** Nothing contained in this Section 11.2 shall limit any Person's rights or obligations under any agreement between such Person and the Company.

**11.3 Insurance.** The Company may purchase and maintain insurance to the extent and in such amounts as the Managers shall, in its sole discretion, deem reasonable, on behalf of such Covered Persons and/or such other Persons as the Managers shall determine, against any liability that may be asserted against or expenses that may be incurred by any such Person in connection with the activities of the Company or such indemnities.

## ARTICLE XII
## RECORDS AND REPORTS

**12.1 Records to be Maintained.** The Managers shall keep or cause to be kept under its direction, on behalf of the Company, proper, reasonably up-to-date, accurate, and complete books and records of the Company's business, including:

(a)     in alphabetical order, one or more current and past lists of the full names and last known, to the extent known, business, residence, or other specified mailing addresses, including related telephone and facsimile numbers and electronic mail addresses, of each Member, and, if more than one address be shown for any such Person, which, if any, such Person prefers for use in connection with the Company;

(b)     in alphabetical order, by Member, current and past lists setting forth the number of Class A Units and Class B Units held by each such Person, his status as a Class A Member and/or Class B Member, or Assignee with respect thereto, the Capital Contribution(s) made with respect to such Unit(s);

-30-

(c)      a copy of the Articles and all amendments thereto;

(d)      a copy of this Agreement and all amendments thereto;

(e)      copies of the Company's federal, state, and local income tax returns and reports, if any, for the six most recent years;

(f)      minutes of every meeting of the Members conducted pursuant to this Agreement;

(g)      copies of any notices of meetings of the Members furnished to the Members including evidence as to the transmission of any such notices (for which an affidavit of transmission shall suffice), and copies of any written waivers of any such notices;

(h)      any written consents of Members regarding action taken by the Members without a meeting;

(i)      a record of the Capital Account of each Member with respect to each Class of Unit, in accordance with Section 7.5; and

(j)      copies of the Company's reports to Members for the three most recent years.

(k)      **accounting records maintained in the accounting system pursuant to the Licensing Agreement attached hereto as Exhibit A.**

**12.2 Form of Maintenance.** The Company may maintain its records in other than written form if such form is capable of conversion into written form within a reasonable time.

**12.3 Place of Maintenance.** The books and the records of the Company shall be kept at the Company's principal place of business or at such other location(s) as the Managers may from time to time determine to keep such records; provided, however, that if such books and records are kept at a location other than the Company's principal place of business they shall be retrievable with reasonable promptness.

**12.4 Inspection.** Each Member himself or through an agent, attorney, or other representative shall, upon reasonable request at least seven business days in advance, and at the expense of the Member or his agent, attorney, or other representative, provided the Member is not in material breach of this Agreement or any other agreement with the Company, have the right to inspect and copy, during normal business hours, any or all the books and records of the Company, for purposes reasonably related to the Member's interest in the Company as such; provided, however, that the Managers or its designee(s) may, for such period of time as the

-31-

Managers or its designee(s) shall deem reasonable, withhold any information it or they reasonably believe to be a trade secret or the disclosure of which is prohibited by agreement with a third party or by law or, in the good faith determination of the Managers or the officer(s) or other Person(s) to whom they may delegate authority to make such a determination, would not be in the best interests of or could damage the Company or its business.

**12.5 Financial and Tax Reporting; Accounting Methods.** The Company shall prepare its financial statements on the cash basis in accordance with generally accepted accounting principles as from time to time in effect with respect to partnerships ("GAAP") and shall prepare its income tax information returns using such methods of accounting as the Managers deems necessary or appropriate under the Code or Treasury Regulations.

**12.6 Annual Reports.** The Managers shall cause to be prepared and, upon request, made available or transmitted to a Member within seventy-five days after the close of each Fiscal Year, a report on the affairs of the Company during or for such Fiscal Year, including financial statements, prepared by an Independent Certified Public Accountant designated by the Managers.

**12.7 Tax Returns.** Within seventy-five days after the end of each taxable year, the Managers shall cause a Federal tax information return to be prepared and filed and shall further cause to be prepared and transmitted to each Member a schedule showing such Member's distributive share of the Company's income, deductions, and credits, and all other information necessary for Members timely to file their Federal income tax returns.

### ARTICLE XIII
### TRANSFER OF UNITS

**13.1 General Restrictions.** Subject to Sections 13.2, 13.3, and 13.4:

(a)     the Member governance rights and the economic benefits associated with a Unit may not be sold, transferred, or otherwise assigned separate and apart from one another (so that the governance rights associated with a Unit held by an Assignee shall be suspended except as set forth in Section 16.2(c), unless and until the Assignee becomes a Substitute Member in respect of the Unit); and

(b)     a Unit or right to acquire a Unit may only be sold, transferred, pledged, hypothecated, encumbered, or otherwise assigned upon approval by the Managers, which Managers' approval may be subject to whatever conditions the Managers may deem advisable in the best interests of the Company and may be withheld for any good reason.

-32-

209540v1

**13.2  Exceptions to General Restrictions.** Notwithstanding Section 13.1 (b) or Section 13.4, but subject to Section 13.3, a Unit may be assigned:

(a)    upon and pursuant to the death of a Member to a spouse or lineal descendant, upon and pursuant to a decree of divorce for or against a Member to his or her former spouse, upon and pursuant the Bankruptcy of a Member, or upon and pursuant the dissolution and liquidation of a Member; or

(b)    to any Entity Controlled, Controlling, or under common Control with the Member.

**13.3  Further Restrictions.**  No assignment of the whole or any part of any Unit may be made:

(a)    unless waived by the Managers, if such assignment, alone or when combined with other assignments or dispositions of Units, would result in termination of the Company within the meaning of Code Section 708;

(b)    unless waived by the Managers, without an opinion of counsel satisfactory to the Managers that such assignment is registered, qualified, or the like under, or is exempt from the registration, qualification, or like requirements of, applicable federal, state, or other securities laws, including the rules and regulations thereunder;

(c)    if to a minor or incapacitated Person, unless made for their benefit to a competent guardian, trustee, or other legal representative of legal age; or

(e)    unless and until the Company receives from the Assignee such tax-related and other information, documents, and agreements it may require, including a taxpayer identification number.

**13.4  Right of First Refusal.**  Except in respect of a transfer of a Unit as permitted by Section 13.2, the Members (prorata in proportion to their Percentage Interest) shall have a right of first refusal in respect of proposed assignments of Units of any Class for value. Such right shall survive for a period of sixty business days following receipt by the Company of notice from the seller setting forth all the material terms and conditions of the proposed assignment, including the identity of the proposed purchaser or lender, and shall be exercisable by the Members by notice of exercise to the seller, whereupon the seller and the purchasing Members shall proceed forthwith and in good faith to consummate the assignment of the Unit(s) to the purchasing Members. The seller shall have sixty days after expiration of the Company's right of first refusal without exercise thereof by the Members or receipt of notice from the Members that they decline to exercise such right of first refusal, whichever occurs first, to consummate the proposed assignment for value of the Unit(s) to be assigned. If such

-33-

209540v1

period expires without consummation of the assignment for value of the Unit(s), the right of first refusal shall be reinstated in respect of the Unit(s) in question.

**13.5 Recognition.** Any purported or attempted assignment of a Unit or benefit or right thereof or thereto in violation hereof shall be void *ab initio* and of no effect, and neither the Company nor the Managers shall be required to recognize the same for the purpose of making distributions pursuant to Article VII or otherwise. Neither the Company nor any Members or other Person shall incur any liability as a result of any refusal to make any distributions to an assignee or otherwise to recognize an assignee as an Assignee pursuant to any such invalid assignment.

**13.6 Indemnification.** In the case of an assignment or attempted assignment of a Unit that has not received the requisite consents, or otherwise in violation of the restrictions on transfer set forth in this Article XIII, the parties engaging or attempting to engage in such assignment shall be liable to indemnify and hold harmless the Company, the other Members, the Managers, and other Covered Persons from all costs, liabilities, and damages that any of such indemnified Persons may incur (including, without limitation, incremental tax liability and attorney's fees and expenses) as a result of such assignment or attempted assignment and efforts to enforce the indemnity granted hereby.

**13.7 Effective Date.** Unless the Managers shall specifically determine otherwise, any valid assignment of a Unit pursuant hereto shall be effective as of the first day of the calendar month following the Managers' approval of such assignment or on the first day of the calendar month following notice to the Company, in form and substance reasonably satisfactory to the Managers, of an assignment not requiring the consent of the Managers. The Company shall, from the effective date of such assignment, pay all distributions on account of the Unit so assigned to the Assignee or Substitute Member with respect such Unit.

**13.8 Costs.** Following a determination by the Company whether a proposed assignment is permissible or impermissible hereunder and, if the consent of the Managers is required, the grant or denial of such consent, the Person who retains or to whom are transferred the economic benefits associated with the Units in question shall promptly, on demand, pay all reasonable expenses of the Company in making such determination and, if applicable, granting or denying consent and/or giving effect to the assignment. The Company may satisfy such demand out of distributions otherwise owed or that may later be owed to such Person or, in the event any such amounts are owing upon liquidation of the Company, through reduction of the proceeds that would be otherwise payable to such Person. Interest shall accrue on such demand at the rate of one and one-half percent (1.5%) per month, or, if lower, the maximum rate permitted by law, beginning on the thirtieth day following such demand. A Person disputing the reasonableness of the expenses for which reimbursement is sought shall furnish notice of protest, including explanation of the basis therefor, within fifteen days after receipt

-34-

209540v1

of the Company's demand for reimbursement. Failure to do so shall constitute waiver of the right to protest the charges. The Company may require a Member and/or proposed Assignee to deposit funds with the Company in advance of or to provide security in the amount of its anticipated expenses for purposes of ensuring prompt payment of its expenses as a condition to determining the permissibility of the proposed assignment and, if applicable, whether to consent and give effect to it.

**13.9  Reasonableness of Restrictions; Specific Enforcement.** Each Member acknowledges the reasonableness of the restrictions on assignment imposed by this Agreement in view of the purposes of the Company and intended taxation of it as a partnership. Accordingly, the restrictions on assignment contained herein shall be specifically enforceable in a court of competent jurisdiction.

**13.10    Right of Co-Sale.** If one or more Members (whether one or more, the "Selling Members") wish to sell, in a single transaction or series of related transactions, Units to any person other than a wholly owned Affiliate of such Member or to another Member, and if the Units proposed to be sold by such Member or Members represent more than 50% of the total Percentage Interests, then, in addition to any provisions of this Operating Agreement which may apply to the proposed sales transaction, each other Member shall have the right (the "Right of Co-Sale") to require, as a condition to consummation of the proposed sale, that there be contemporaneously sold in the same transaction, to the same purchaser, for the same consideration, and on the same terms, a portion of the Units owned by such other Member which represent the same percentage relationship to the Percentage Interest of such other Member as the Percentage Interest of the Units to be sold by the Selling Members bears to the total Percentage Interest, then owned by the Selling Members.

Written notice of any proposed transaction to which this Section 13.10 applies (a "Co-Sale Transaction") shall be given to each Member (other than the Selling Members) at least 30 days before the scheduled consummation date of the Co-Sale Transaction. The notice from the Selling Members shall describe all material terms and conditions of the Co-Sale Transaction, including the Percentage Interest of the Units to be sold by the Selling Members, the amount and form of the consideration to be paid by the proposed purchaser, the identity of the proposed purchaser, and the scheduled consummation date of the Co-Sale Transaction. If with respect to any Co-Sale Transaction another Member wishes to exercise its Right of Co-Sale, then within 30 days following his receipt of notice of the Co-Sale Transaction, such Member shall give the Selling Members written notice of his election to exercise the right. An election to exercise its Right of Co-Sale shall bind a Member to sell the portion of his or her Units to which the Right of Co-Sale applies in, and on terms identical to those of, the Co-Sale Transaction.

If any one or more Members exercise their Right of Co-Sale under this Section 13.10, then (i) the aggregate Units to be sold by all Members (including the Selling

-35-

Members) in the Co-Sale Transaction shall be the number of Units originally proposed to be sold in the Co-Sale Transaction by the Selling Members, and (ii) the Units to be sold in the Co-Sale Transaction by each Member participating in the Co-Sale Transaction (including the Selling Members) shall be allocated among such Members proportionately in accordance with the ratio obtained by dividing (x) the Units owned by each such Member by (y) the total Units owned by all such Members.

**13.11    Required Sales.**  If (i) one or more Members wish to sell, in a single transaction or series of related transactions, all of their Units to any person other than another Member or a wholly owned Affiliate of such Members, and (ii) the Units represent a Percentage Interest that is more than 50% of the Units of the Company, then, upon demand by said selling Member or Members, each non-selling Member shall have the obligation to sell all of such Member's Units in the same transaction to the same purchaser, for the same consideration, and on the same terms.

Written notice of any proposed transaction to which this Section 13.11 applies (a "Sale Transaction") shall be given to each Member at least 30 days before the scheduled consummation date of the Sale Transaction. The notice from the proposed sellers shall describe all material terms and conditions of the Sale Transaction, including the Units be sold by the proposed selling Member or Members and their respective Percentage Interest, the amount and form of the consideration to be paid by the proposed purchaser, the identity of the proposed purchaser, and the scheduled consummation date of the Sale Transaction. Upon receipt of the notice of the Sale Transaction, a Member shall be obligated to sell all of his or her Units in accordance with the terms set forth in said notice, and shall execute and deliver all such instruments and documents, and shall take all such other action as shall be reasonably requested of him or her in order to accomplish the sale.

**13.12  Option to Acquire.**  Plastic2Oil Land, Inc. shall have the right to purchase all Class A Membership interests and all Class B Membership interests on or before the 10th anniversary of the formation of the Company, but not sooner than three years from the anniversary date, as follows:

As to Class A Membership Units, the purchase price shall be equal to the amount of unredeemed capital initially contributed by the Class A Members or, in the event the Class A member is a guarantor, upon payment of the debt of the Company guaranteed by the Class A Member or the delivery of a release of the Class A member as a guarantor of loans made to the Company by the owner and holder of such debt.

As to Class B Membership Units, the purchase price shall be equal to a sum determined under the following formula: % of Class B Membership multiplied by 10 times the 3 year weighted average of EBITDA of the Company less the amount required to redeem Class A Membership Units notwithstanding who the owner or holder thereof and less

-36-

all debt of the Company. The 3 year weighted average of EBITDA shall be determined as follows: the sum of a) most current fiscal year EBITDA multiplied by 3, b) next most current fiscal yr EBITDA multiplied by 2 c) next preceding most current fiscal yr EBITDA divided by 6.

Such right of purchase shall be exercised by written notice delivered by Plastic2Oil Land, Inc., its successors or assigns and the closing of such purchase and cash payment made on a date that is not later than 30 days following the delivery of such notice but not before the 10th anniversary of the formation of the Company.

## ARTICLE XIV
## DISSOLUTION, LIQUIDATION, AND TERMINATION

**14.1 Additional and Substitute Members.**   The Company shall not be dissolved by the admission of Additional Members or Substitute Members in accordance with the terms of this Agreement. Rather, upon the occurrence of any such event, the business of the Company shall be continued without dissolution by the remaining, including the new, Members.

**14.2 Events Causing Dissolution.**   The Company shall be dissolved and its affairs shall be wound up upon the first of any of the following events to occur:

**(a)**      determination by the Managers that the Company should be dissolved;

**(b)**      the entry of a decree of judicial dissolution under the Act;

**(c)**      the disposition of all or substantially all of the Company's assets other than cash and marketable securities; or

**(d)**      any event that makes it impossible, manifestly unlawful, or clearly impractical to carry on the business of the Company.

**14.3 Notice of Dissolution.**   Upon the dissolution of the Company, the Managers shall promptly notify the Members of such dissolution.

**14.4 Liquidation.**  Following dissolution of the Company, the Managers or the Liquidator, as the case may be, shall promptly (a) prepare and furnish to Members, or cause to be prepared and furnished to each Member, (i) a statement setting forth the Company's assets and liabilities as of the date of dissolution and (ii) such Member's Capital Accounts, and (b) commence to wind up the Company's affairs, liquidate its assets, and distribute the net proceeds therefrom; provided, however, that the Managers or the Liquidator may continue to conduct the business and affairs of the Company for a reasonable period of time so as to allow for the orderly liquidation of its assets,

-37-

209540v1

discharge of its liabilities, distribution of any remaining assets, and termination of the Company and its business so as thereby to enable the Members to minimize the normal losses attendant upon a liquidation.  The Members shall continue to share Profits and Losses during liquidation in the same proportions specified in Article VII as before liquidation.  The proceeds of liquidation shall be distributed, as realized, in accordance with the positive balances in Members' capital accounts after the allocation of all Profits and Losses in the proportions that Members' respective positive balances bear to the total of such positive balances and, after all such positive balances shall have been paid in full, to the Members prorata in proportion to their respective Percentage Interests. In the event of a liquidation of the Company, Class A Members shall be fully redeemed prior to any payment to Class B Members

**14.5 Termination.** The Company shall terminate when, following payment of or due provision for all its debts, liabilities, and obligations and distribution of all of its assets in the manner provided for in this Article XIV, the Managers or Liquidator, as the case may be shall file, as shall be its duty, a certificate with the Department canceling the Articles.

**14.6 Claims of Members.** The Members shall look solely to the Company's assets for the return of their Capital Contributions, and if the assets of the Company remaining after payment of or due provision for all its debts, liabilities, and obligations are insufficient to return such Capital Contributions, the Members shall, merely as a result thereof, have no recourse against the Company or any past or present Member.

**14.7 Compensation of Liquidator.** A Liquidator shall be entitled to receive such compensation in connection with the winding up of the Company as is agreed upon between the Managersand the Liquidator. The Liquidator's compensation shall be an expense of the Company and treated for purposes of distribution as a liability of the Company.

## ARTICLE XV
## MISCELLANEOUS

**15.1 Notices.** Except as otherwise specified herein, whenever, under the provisions of the Act, the Articles, or this Agreement, notice, demand, or other communication is required or provided for, such notice, demand, or other communication shall be (i) in writing, duly signed by the party(ies) giving or making such notice, demand, or communication, and (ii) delivered by certified mail (postage prepaid, return receipt requested), hand (delivery costs paid or agreed to be paid by the Person(s) transmitting the notice), electronic mail, or (unless delivery to the appropriate

209540v1

address cannot be made by the courier) by nationally recognized express or air mail courier (costs prepaid or to be billed to the shipper(s)), as follows:

(a)   if to the Company, to 1331 Cleveland Street Clearwater, Florida 33765 c/o Mark Lagos (727)-446-4051

(b)   if to a Member, at the (if more than one, the preferred, if indicated, or otherwise any of them) current address set forth for such Member on the then current list of Members maintained by the Company pursuant to Section 12.1(a); and

(c)   if to the Managers, to the address provided by each of them to the Company, 1331 Cleveland Street Clearwater, Florida 33765 c/o Mark Lagos (727)-446-405;

If mailed, a notice shall be deemed furnished and shall be effective two days following deposit thereof in the United States mail addressed as specified above.  If delivered by hand, a notice shall be deemed furnished and shall be effective on the day hand delivered to the address specified above.  If delivered by electronic mail, a notice shall be deemed furnished and shall be effective the day on which sent to the electronic mail address, if any, for the address specified above.  If delivered by express or air mail courier, a notice shall be deemed furnished and shall be effective on the day specified or agreed to by the courier for delivery to the address specified above.  Senders shall, upon receiving information that a facsimile or electronic mail notice delivery of which was confirmed electronically in fact did not reach the Person to whom directed, re-send the notice; but neither the receipt of such information or the re-sending of the notice shall affect the validity of the original notice.

An affidavit that notice has been properly given by any person charged by the Managerswith such task shall, in the absence of fraud, be *prima facie* evidence of the facts stated therein.

Notwithstanding the foregoing or any other provision of this Agreement, no further notices shall be required to be furnished if three successive attempts to furnish notice to the addressee, as specified above, are returned as undeliverable or have otherwise been unsuccessful, and the sender shall have once attempted to call the addressee following all such foregoing attempts at the addressee's telephone number at such address and been unsuccessful in reaching the addressee, or, if having reached the addressee or a representative of him or (including the leaving a voice mail message), it shall not have received notice of a new address/or facsimile number from the addressee or a representative of his within ten days after such call.

**15.2  Amendment.**

209540v1

(a)   **General.** Except as otherwise provided herein, this Agreement may be amended only upon the consent of the Class B Members.

(b)   **Amendments by Managers without Consent of the Members.** In addition to any amendments otherwise authorized to be made by it in this Agreement, the Managers may at any time, without the consent of the Members, amend the Articles and/or this Agreement: (i) to reflect changes in **Schedule A**; (ii) in a manner that does not adversely affect the rights of any Member, in any material respect; (iii) to correct an error or resolve any ambiguity or inconsistency among provisions of or to otherwise clarify the Articles or this Agreement, provided the amendment does not materially change the substance of the Articles or this Agreement; or (iv) to delete or add any provision to the Articles or this Agreement required to be so deleted or added by any federal or state securities or any other governmental authority.

(c)   **Amendment Requiring Consent of Affected Persons.** Notwithstanding anything to the contrary in this Section 15.2, neither the Articles nor this Agreement may, without the consent of the Managers and the Members be amended to: (i) reduce the limitations on the liability of a Member, as such; (ii) otherwise impose any new or additional liability or duty on a Member, as such; (iii) alter the status of the Company as a partnership for federal income tax purposes; (iv) modify the compensation, distributions, allocations, or rights of reimbursement, voting, or indemnification to which one or more Member(s), as such, is (are) entitled pursuant to the terms hereof; or (v) otherwise disproportionately, adversely, and materially affect the value of a Member's Units *vis-à-vis* any other class of Member's Units; or (vii) amend this Section 15.2(c).

(d)   **Effectuating Amendments.** The Managers shall have the duty and authority to amend the Articles and this Agreement and to cause amendments to be made to the Articles and this Agreement as and to the extent necessary or appropriate to reflect any and all amendments approved or made by the Managers and the Members as provided herein. Notices of any amendments made shall promptly be sent to the Members, but the failure to furnish such notices shall not affect the validity or effect of the amendment or result in the imposition of any liability on any Person.

(e)   **Proposal of Amendments.** Amendments to the Articles or this Agreement may be proposed in writing by the Managers or by one or more Members owning at least 51% of the voting power of the Company. Any such proposal must, if required by the Managers, be accompanied by a description of the purpose and effect of the proposed amendment.

-40-

**15.3 Binding Effect.** This Agreement shall be binding upon and inure to the benefit of all of the Members, as well as to their Affiliates, and to the foregoing Persons' successors, legal representatives, and assigns.

**15.4 Waiver of Right to Decree of Dissolution.** The parties agree that irreparable damage would be done to the goodwill and business affairs of the Company if any Member, should bring an action to dissolve the Company. Care has been taken in this Agreement to provide fair and just payment in liquidation of the Units of all Members. Accordingly, each party hereby waives and renounces its right to a decree of dissolution or to seek appointment of a receiver and/or liquidator for the Company except as may be sought by the Company itself.

**15.5 Waiver.** Except as provided otherwise herein, any waiver of any provision, right, power, or remedy hereunder must be expressly in writing specifically referencing this Agreement and signed by the waiving party or its authorized representative to be valid. No acceptance of payment or performance after any breach of this Agreement shall be deemed to be a waiver of such or any other breach of this Agreement whether or not the Member, or the Company knew of such breach at the time it accepted such payment or performance. Also, the failure or delay of any party at any time to require performance by another party of any provision of this Agreement, even if known, shall not affect the right of such party to require performance of that provision or such party's exercise of any right, power, or remedy hereunder, and any waiver by any party of any breach of any provision of this Agreement should not be construed as a waiver of any continuing or succeeding breach of such provision, waiver of the provision itself, or waiver of any other right, power, or remedy under this Agreement. No notice or demand on any party in any case shall, of itself, entitle the receiving party to any other further notice or demand in any similar or other circumstance.

**15.6 Enforcement Costs.** If any legal or other proceeding is brought to enforce this Agreement, or because of a dispute or alleged breach, default, or misrepresentation under this Agreement, the prevailing party(ies) shall be entitled to recover reasonable attorneys' fees, court costs, arbitration fees, and other expenses (including all fees, costs, and expenses incident to any appeals or post-judgment or -award proceedings) incurred in or in connection with such action or proceeding. Attorneys' fees shall include paralegal fees, investigative fees, expert fees, administrative costs, sales and use taxes, and all other charges reasonably billed by the attorneys to the prevailing party.

**15.7 Counterparts; Facsimile Delivery.** This Agreement and consents hereunder may be executed in any number of counterparts with the same effect as if all parties hereto had signed the same document. All counterparts shall be construed together and shall constitute one instrument. A party may effectively execute and deliver this Agreement or any consent hereunder by signing the signature page and

209540v1

sending the executed signature page via facsimile. Such facsimile copy of the signature page shall be sufficient evidence of such party's execution of this Agreement or such consent.

**15.8 Further Assurance.** The parties hereto agree, on behalf of themselves and their direct and indirect successors and assigns in interest, to execute and deliver any further instruments or documents and to perform any additional acts which are or may become necessary to effectuate and carry on the Company or this Agreement.

## ARTICLE XVI
## CONSTRUCTION

**16.1 Integration.** This Agreement constitutes the entire agreement among the parties hereto pertaining to the subject matter hereof and supersedes all prior agreements and understandings pertaining thereto.

**16.2 Governing Law.** This Agreement and the rights of the parties hereunder shall be interpreted in accordance with the laws of the State of Delaware, and all rights and remedies shall be governed by such laws, without regard to principles of conflicts of law.

**16.3 Relationship of Agreement to Act.** Except to the extent that a provision hereof expressly incorporates federal income tax rules by reference to sections or provisions of the Code or Treasury Regulations or is expressly prohibited by or ineffective under the Act, this Agreement shall govern even when inconsistent with or different from the provisions of the Code, Treasury Regulations, or Act. To the extent any provision of the Agreement is prohibited by or ineffective under the Code, Treasury Regulations, or Act, the Agreement may be amended by the Managers to the smallest degree possible in order to make the Agreement effective thereunder, as determined by the Managers in their reasonable discretion. In the event the Code, Treasury Regulations, or Act is (are) subsequently amended or interpreted so as to make valid any provision of the Agreement formerly invalid, such provision shall be considered part of this Agreement from and after the date of such amendment or interpretation.

**16.4 Severability.** The invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions hereof, and this Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted.

**16.5 Cumulative Remedies.** The rights and remedies provided by this Agreement are cumulative and the use of any one or more rights or remedies by any party shall not preclude or waive his or its right to use any or all other remedies. Said

209540v1



rights and remedies are given in addition to any other rights the parties may have by law, statute, ordinance, or otherwise.

**16.6  Rights of Creditors and Third Parties.**  This Agreement is entered into among the Members, and between the Company and the Members, for the exclusive benefit of the Company and its Members.  Except as expressly provided otherwise herein, this Agreement is not intended for the benefit of any creditor of the Company or any other Person.  Thus, except to the extent expressly provided otherwise herein or as provided by applicable law, no such creditor or other Person shall have any rights under this Agreement or any agreement between the Company and any Member with respect to any Capital Contribution or otherwise.

**16.7  Legal Representation.**  This agreement was prepared by counsel to the Company.  Each Member acknowledges that such counsel acted only for the Company and not any Members.  Each Member further acknowledges that he has reviewed this Agreement, alone or together with such counsel, accountants, and/or other advisers such Member deemed it necessary or advisable, in his sole and absolute discretion, to consult, and that, having done so, such Member has freely and voluntarily entered into this Agreement.  Accordingly, no provision of this Agreement shall be construed against the Company because counsel to the Company prepared the Agreement.

**16.8  Time.**  In computing any period of time pursuant to this Agreement:

**(a)**  days shall be calendar days, unless otherwise specified;

**(b)**  the day of the act, event, or default from which the designated period of time begins to run shall not be included, but rather the time shall begin to run on the next succeeding day;

**(c)**  the last day of a period shall be included;

**(d)**  if the last day of a period is a Saturday, Sunday, or legal holiday, the period shall run until the end of the next day which is not a Saturday, Sunday, or legal holiday; and

**(e)**  for purposes of the end of a time period or the furnishing of a notice, days shall end at 5:30 p.m. EST (so that any time from 5:30 p.m. EST to midnight EST shall be deemed part of the next succeeding day).

**16.9  Schedules**  The schedules hereto shall be part of this Agreement the same as if the text thereof had been directly included in the provision(s) making reference thereto.

209540v1

## SIGNATURE PAGE

Managers:

Name: Markos Lagos

Date: 2-12-10

Name: Andrew J. Lynn

Date: 2-12-10

Schedule showing Class A and Class B Members and contributions of each and joinder of Members as parties hereto attached.

-44-

209540v1

**Class A Member:**

**ES RESOURCES, LLC**

By: _____
Name: Markos Lagos
Title: Manager

**Amount to be provided or guaranteed by ES Resources, LLC:
Not to exceed $525,000**

209540v1

**Class B Member:**

**ES RESOURCES, LLC**

By:
Name: Markos Lagos
Title: Manager

EIN: _+/b/d_

Capital Contributed: $480.00

Membership Interest:  48%

−46−

209540v1

**Class B Member:**

**AS PTO, LLC**

By: _____

Name: <u>Al Sousa</u>

Title: Manager

EIN: _O_____

Capital Contributed: $<u>40.00</u>

Membership Interest:  <u>4%</u>

-47-

209540v1

Class B Member:

**Plastic2Oil Land, Inc.**

By:_____
Name:John Bordynuik
Title: CEO

EIN:_____

Capital Contributed: $480.00

Membership Interest:  48%

Case Number:13-003971-CI

Electronically Filed 04/11/2013 12:32:20 PM ET

***ELECTRONICALLY FILED 4/15/2013 12:35:19 PM: KEN BURKE, CLERK OF THE CIRCUIT COURT, PINELLAS COUNTY***

# INTELLECTUAL PROPERTY MASTER LICENSE AGREEMENT

## Plastics2Oil Technology

AGREEMENT, made as of the last signature date , by and between Plastic2Oil Land, Inc. , a Nevada corporation, having its corporate offices at 500 Technology Square Cambridge, MA 90212 (herein "Licensor"), and Plastic 2 Oil of Clearwater 1, LLC, a Delaware limited liability corporation having its corporate offices at 1331 Cleveland Street Clearwater, FL 33765 (herein "Licensee").

## WITNESSETH

WHEREAS, Licensor is the exclusive licensee for terrestrial applications of certain plastic waste recovery and conversion technologies (the "Intellectual Property"), which Intellectual Property includes proprietary technologies, brands, machinery, accounting systems, compositions and methods; and

WHEREAS, Licensor wishes to grant to Licensee and Licensee wishes to obtain from Licensor an exclusive license in the Territory to use and exploit the Intellectual Property in the operation of plastic waste recovery and conversion sites.

NOW, THEREFORE, in consideration of the initial license fee as enumerated herein, the foregoing premises and the mutual covenants herein contained, the parties agree as follows:

## 1. Definitions

As used in this Agreement, the following terms shall have the following meanings:

(a) "P2O Processing" shall mean operation of a physical site location that utilizes the Intellectual Property, including any Improvements.

(b) "Improvements" shall mean any improvement, refinement, enhancement or other modification of the Intellectual Property.

(c) "License" shall mean that exclusive license which the Licensor hereby grants to the Licensee to use and exploit the Intellectual Property, including Improvements as set forth in Paragraph 6 hereof, subject to the terms hereof.

(d) "Gross Sales" shall mean all revenues received by Licensee and its affiliates and licensees generated directly or indirectly by P2O Processing.

(e) "Territory" shall mean that portion of the State which is located in Pinellas County of the State of Florida, as such may be modified from time to time as depicted on the map attached hereto as Exhibit A.

(f) "Catalyst" shall mean the proprietary, trade secret composition exclusively supplied by Licensor or designate to Licensee.

## 2.  Grant of Rights

(a)  **License Grant.**  Subject to the terms and conditions herein contained and for good and valuable consideration, the receipt of which is hereby acknowledged, Licensor hereby grants to Licensee, subject to the terms hereof, an exclusive License to commercialize the Intellectual Property and Improvements throughout the Territory for P2O Processing sites located in the Territory.  Licensor hereby agrees promptly to disclose or supply to Licensee the Intellectual Property licensed hereby.

(b)  **No Rights to Third Parties.**  Licensee shall not sell, lease or authorize third parties not bound to this agreement to exploit P2O Processing, and shall take all steps reasonably requested by Licensor to prohibit others from selling, leasing or practicing P2O Processing anywhere outside the Territory without the prior written consent of Licensor.

(c)  **Trade Secret Marking.**  All products, including, without limitation, proprietary catalysts, which are distributed, sold or utilized in any manner and which incorporate in any manner all or any part of the Intellectual Property contained within the License granted hereunder, will bear the proper proprietary rights notice, all as specified in writing by Licensor to Licensee, as shall be sufficient, in Licensor's judgment, to protect its rights and interest in the rights granted by Licensor to Licensee pursuant hereto.  Licensee further agrees to give proper notice of trademarks, patents, trade secret markings and/or copyrights where applicable in connection with the use by Licensee of any rights hereunder, as may be specified from time to time by Licensor.

(d)  **Promotion of Technology.**  Licensee agrees that during the term of this Agreement, it will diligently and actively develop, promote, distribute and market P2O Processing in the Territory.  Licensee shall be permitted to use Licensor's brands which may include PLASTIC2OIL, P2O, P2OIL but only as a trademark identifying the technology employed in the process not as a trade name.  For example, a proper use of the brand would be "ACME Oil Recovery Corporation....using P2O™ Technology."  Licensor reserves the right to terminate Licensee's right to use its brands in the event Licensee's use is improper, Licensee's use would, in the sole opinion of Licensor, incur a claim of third party infringement, or as otherwise required by Licensor to protect the value and goodwill associated with its brands.  Licensee agrees to waive any right to challenge the validity of Licensor's brands before the U.S. Patent & Trademark Office or any court of competent jurisdiction.

(e)  **Feedstock.**  Licensee shall secure, at market prices, all feedstock required for P2O Processing and shall provide Licensor with a collateral assignment of said contract.  Prior to Licensor delivery of Processing Equipment Licensee shall have a contract(s) for the feedstock supply of a minimum of 20 tons per day average.

(f)  **Processing Equipment.**  Licensor or its designate shall supply to Licensee all equipment and parts required for the operation of the P2O Processing.  Licensor shall also assemble and oversee the start-up of each operating unit.  Licensee shall pay these costs within ten (10) days of the completion of the set up and receipt of permits by the applicable governmental agencies.  Prior to delivery the price for the Processing

Equipment and set up shall be set by Licensor and agreed upon by Licensee. In the event that the price cannot be agreed upon then this license will become void and the License Fee shall be promptly returned with no deduction.

(g) **Catalyst.** Licensor or its designate shall supply Catalyst to Licensee at five dollars (US$5.00) per kilogram. Catalyst price may be increased annually by Licensor in alignment with the Consumer Price Index (CPI) as published by the United States Bureau of Labor Statistics.

(h) **No Reverse Engineering.** Licensee acknowledges that Catalyst is a critical asset to Licensor and its value is maintained by its proprietary, trade secret status. Catalyst shall *not* be analyzed, sampled, tested, transferred or otherwise reverse engineered by Licensee. Licensee waives any and all objections to Licensor's motion for a temporary restraining order and/or preliminary injunction to the extent such motion reasonably relates to preserving the trade secret status of Catalyst.

(i) **Anti-Tampering Container.** Catalyst shall be delivered to Licensee in tamper-detection containers which may disable Licensee's P2O operation in the event the container's anti-tampering system is intentionally or unintentionally activated. Licensee shall abide by Licensor's guidelines in handling such containers. In the event that Licensee activates the container's anti-tampering system at no fault of Licensor, Licensee shall pay Licensor's reasonable, documented out-of-pocket costs associated with validating the nature of the activation, resetting any deactivated systems and delivering a replacement container of Catalyst.

3. **Consideration.**

(a) **Initial License Fee.** In consideration for the License granted hereunder, Licensee shall pay Licensor an initial license fee of one hundred twenty five thousand ($125,000.) Licensee acknowledges that this license fee is 50% of the standard two hundred fifty thousand dollars (US$250,000.00) license fee and that Licensee acknowledges it is hereby exercising one of its "Rights to Acquire" pursuant to the agreement between Licensee and Licensor's parent company, JBI). The License Fee shall be due upon execution of Agreement, less any reservation deposit(s) that have been made.

(b) **Royalties.** Payments from Licensee to Licensor in the form of royalties shall be calculated based on **ten percent (10%)** gross sales of fuel recovered from P2O Processing. Payments shall be transmitted by electronic data interchange (EDI) from Licensee to Licensor. Each party shall bear its own cost for the fund transfers. EDI payments from Licensee to Licensor shall be made immediately upon pumping of fuel recovered by P2O Processing for distribution. Sales of fuel recovered by P2O Processing shall be made at the previous day's closing WTI Cushing Crude Spot Price (herein "Market Rate") less three dollars (US$3.00) per barrel. Should Licensee repurpose saleable fuel for its internal operation it shall still be responsible for payment of royalties at Market Rate less three dollars (US$3.00) per barrel.

(c) **Minimum Performance.** Licensee shall be required to meet the following minimum performance requirements:

(i) Within one hundred twenty (120) days of receipt of final operating permits, Licensee shall process an average minimum of five (5) metric tons per day of plastic waste.

Confidential and Proprietary

(ii) Following the first one hundred twenty (120) days of operation as provided above, maintain an average of five (5) metric tons per day calculated every quarter for one year.

(iii) Maintain an average of ten (10) metric tons per day calculated every quarter for the second year.

(iv) Maintain an average of twenty (20) metric tons per day calculated every quarter for every year thereafter.

(d) **Feedstock Availability.** Minimum performance provisions shall be waived should Licensee show that it is unable to locate necessary feedstock on commercially reasonable terms to meet the minimums after diligently seeking to do so.

(e) **Performance Shortfalls.** In the event minimum performance requirements are not met under Section 3(c) above, Licensee may avoid default of Agreement by paying Licensor royalties calculated by the shortfall in performance. Licensee may pay shortfalls for up to four (4) consecutive quarters to avoid default of Agreement.

(f)      **Taxes.** Each Party will be responsible for any taxes on property it owns or leases, for any franchise or privilege tax on its business, and for any tax based on its gross or net income or gross receipts. Licensor will pay for any tax on goods or services it uses to provide the Catalyst and/or feedstock. Licensor will pay and Licensee will reimburse Licensor for any federal, state, or local sales, use, excise, or similar tax applicable to the supply and delivery of Catalyst and/or feedstock, if any. The Parties will cooperate to more accurately determine and minimize their respective tax liability. Each Party will provide tax information or tax documents reasonably requested by the other Party. Each Party will promptly notify the other of any claim for taxes asserted by a taxing authority with jurisdiction over either Party. With respect to any claim arising out of a form or return signed by a Party to this Agreement, the signing Party may control the response to and settlement of the claim, but the other Party may participate to the extent it may be liable.

## 4. License and Reservation of Rights

(a) All rights not specifically granted to Licensee hereunder are reserved to Licensor.

## 5. Confidentiality and Non-Compete

(a) **Confidentiality.** Licensee shall maintain in strict confidence and shall not at any time whether before or after the termination of this agreement (a) utilize for any purpose other than as permitted under this License, or cause, enable, assist or permit anyone else to utilize, any of the Intellectual Property or Improvements; or (b) disclose to anyone any such Intellectual Property, Improvements and/or related information (the "Confidential Information") which is not generally available to the public unless, (i) through no act of Licensee contrary to the obligations imposed hereby, such Confidential Information becomes known to the public prior to the date of Licensee's disclosure, (ii) such Confidential Information is approved for public release by Licensor, (iii) such Confidential Information is rightfully received by Licensee from a third party without restrictions and without breach of Licensee's obligations hereunder, (iv) such Confidential Information is independently developed by Licensee without breach of this Agreement, (v) such Confidential Information is required to be disclosed by judicial or governmental proceeding subject to a protective order or (vi) such disclosure is necessary or appropriate to the exploitation of the License granted hereby and only then after such person or entity to whom disclosure is to be made executes a confidentiality agreement acceptable to Licensor.   Notwithstanding the foregoing, Licensee may disclose such Confidential

Information to its employees who need to know such information in order for Licensee to use and exploit the Intellectual Property pursuant to the terms of this Agreement if it has taken reasonable steps to impose the aforesaid covenants of confidentiality on said employees and to ensure that said employees will not violate said covenants, including, but not limited to, causing said employees to enter into written agreements in which said covenants of confidentiality are effectively imposed upon them. Licensee will copy Licensor's Confidential Information only to the extent reasonably necessary to enable Licensee to exercise its rights under the License. In making any such copies, Licensee agrees to produce faithfully all notices respecting copyright, trade secrets, and other proprietary rights. Nothing contained herein shall prevent Licensee from disclosing in general terms the nature of its relationship with Licensor.

(b) **Non-Compete.** For five (5) years or the maximum length permitted by law in the relevant jurisdiction (whichever is less), after the expiration of Agreement, Licensee shall not engage in commercial activity or otherwise compete with Licensor or its licensees in the recovery of fuel from waste plastic.

## 6. Improvements

Any improvements upon the Intellectual Property made, conceived, invented or wholly acquired by Licensor during the term of this Agreement, shall be included hereunder, and Licensee shall have the right to such improvements (limited, however, by the specific terms hereof) without payment of any additional royalty. Licensee agrees that if during the term of this Agreement it should make, conceive, invent or acquire any improvements to the Intellectual Property, or any component or portion thereof, it will grant, and hereby does grant, to Licensor a royalty-free, exclusive, paid up, perpetual license, to use such improvements, on a worldwide basis. Each party agrees to disclose promptly to the other party all improvements so made, conceived, invented or acquired during the term of this Agreement which are based, in whole or in part, on any of the Intellectual Property or Improvements.

## 7. Representations

Licensor represents and warrants that: (i) it has the right and authority to enter into this Agreement; (ii) to the best of its knowledge, it is the sole owner or licensee of all Intellectual Property and Improvements licensed hereunder and the use thereof will not violate any law or infringe upon or violate any rights of any person, firm or corporation; (iii) it is not a party to any other existing agreement which would prevent it from entering into or performing its obligations under the terms of this Agreement and (iv) to the best of its knowledge, the proprietary technology has been legally acquired and/or developed and has not been challenged and no adverse claim has been asserted. In addition, Licensor shall defend and indemnify Licensee from and against any claim that the use by Licensee of any of the tools, technologies, or other Intellectual Property rights to be furnished or made available by Licensor pursuant to this Agreement infringes, violates or interferes with the rights of any other Person. The indemnification obligations of Licensor contained in the foregoing sentence do not apply if and only to the extent the allegedly infringing tools, technologies, or other Intellectual Property of Licensor (i) are modified by Licensee or for Licensee by any Person or entity other than Licensor, if the alleged infringement would not have occurred but for such modification; (ii) are the result of Licensor's compliance with Licensee's express direction to modify the tools, technologies, or other Intellectual Property of Licensor where the alleged infringement would not have occurred but for such modification, unless Licensor knew or had reason to know that the directions infringed a third party's rights or Licensor chose an infringing implementation of such directions even though

reasonable non-infringing implementations were available without additional implementation cost or time; or (iii) are the result of Licensee's continued use of allegedly infringing tools, technologies, or other Intellectual Property of Licensor after Licensor has made a non-infringing, functionally-equivalent, and non-breaching release of such Intellectual Property of Licensor available to Licensee (at no additional cost or license fee) and given Licensee a reasonable period of time to implement such release, if the alleged infringement would not have occurred but for such continued use.  Without limiting the foregoing, in the event of a claim that any Intellectual Property of Licensor violates or infringes any third party Intellectual Property right, Licensor shall use commercially reasonable efforts to either (i) modify the allegedly infringing Intellectual Property so as to cause it to not infringe such third party Intellectual Property right (without materially diminishing the functionality or performance of such Intellectual Property); or (ii) obtain for Licensee the right to continue using such allegedly infringing Intellectual Property.  In the event that, following the application of such commercially reasonable efforts, Licensor is unable to modify the Intellectual Property as described above or procure for Licensee the right to continue using such Intellectual Property, Licensor shall have the right to terminate Licensee's license to the allegedly infringing Intellectual Property with a pro-rated return of the initial licensing fee amortized over a two-year period.

EXCEPT AS EXPRESSLY STATED IN THIS AGREEMENT, LICENSOR SHALL HAVE NO LIABILITY FOR THE MATERIALS, DESIGN, SYSTEMS, PROCEDURES AND SOFTWARE PROVIDED, INCLUDING ANY LIABILITY FOR NEGLIGENCE; LICENSOR MAKES AND LICENSEE RECEIVES NO WARRANTIES, EXPRESS, IMPLIED, STATUTORY, OR IN ANY OTHER PROVISION OF THIS AGREEMENT OR ANY OTHER COMMUNICATION; AND LICENSOR SPECIFICALLY DISCLAIMS ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

Neither Party shall be liable to the other for special, indirect, incidental, consequential, exemplary or punitive damages of the other or for any form of damages other than direct damages arising out of or in connection with this Agreement or the subject matter hereof. Notwithstanding the foregoing, the limitations of liability in this Agreement shall not apply to limit (i) a party's indemnification obligations under this Article, or (ii) damages arising from fraud or willful misconduct.

## 8. Litigation

Licensor shall have the right, but not the obligation to initiate or join in litigation relating to infringement of Intellectual Property.  Licensee agrees to promptly notify Licensor of suspected or confirmed infringement of Intellectual Property.

## 9. Insurance

(a)  During the term of this Agreement, Licensee will maintain, at its own expense, in full force and effect, with a responsible insurance carrier, reasonably acceptable to Licensor, such liability insurance as is customary for a business of the type, nature and size of Licensee.

(b)  Licensee shall, from time to time, but no less frequently than annually, upon reasonable request by the other party, promptly furnish or cause to be furnished to Licensor, a certificate evidencing the insurance required hereby.

## 10. Term and Termination

(a) **Term.** Unless terminated sooner by the operation of Paragraphs 10(b) or (c) hereof, this Agreement shall terminate ten (10) years from execution date , but shall be extended for successive five (5) year terms so long as Agreement, or a successor thereof, is in effect.

(b) **Termination for Breach.** In the event that the Licensee materially defaults or breaches any provision of this Agreement, Licensor reserves the right to terminate this Agreement upon written notice to Licensee; provided, however, that if Licensee, within ten (10) business days of such written notice, cures such default or breach, this Agreement shall continue in full force and effect as if such default or breach had not occurred; and provided, further, should Licensee dispute any such alleged breach of this Agreement and such dispute is either submitted to arbitration in due course pursuant to Paragraph 18 hereof or being resolved by the parties hereto, then there shall be no default hereunder during the period in which the parties are in arbitration or diligently, and in good faith, attempting to resolve such dispute; provided, that after the parties reach an agreement or an arbitrator makes its decision, Licensee shall comply therewith within thirty (30) days thereof.

(c) **Bankruptcy.** In the event of any adjudication of bankruptcy which is not vacated within sixty (60) days, appointment of a receiver by a court of competent jurisdiction who is not removed within sixty (60) days, assignment for the benefit of creditors or levy of execution directly involving Licensee, this Agreement shall thereupon forthwith terminate and no longer be of any further force and effect.

(d) In the event of termination of this Agreement for any reason whatsoever:

(i) Licensee shall deliver to Licensor all materials, compositions (including all supplies of Catalyst), books, notes, drawings, writings and other documents, in the possession of Licensee or the Permitted Parties relating to the Intellectual Property and any Improvements licensed to it under Paragraph 2(a) hereof (except that in connection with any Improvements made by Licensee it may retain copies of all such items delivered to Licensor and may continue to use any such Improvements made by it), together with all copies of any Confidential Information.

(ii) All rights granted by Licensor to Licensee shall forthwith revert to Licensor.

(iii) Licensor (in the event this Agreement is terminated by reason of Licensee's default hereunder) shall continue to be entitled to use or exploit any exclusive royalty-free license to new developments of Licensee granted pursuant to Paragraph 6 hereof.

(e) In the event of termination of this Agreement, Licensee shall assign to Licensor, at the request of Licensor, all of its right, title and interest in and to any contracts or agreements relating, directly or indirectly, to the Intellectual Property.

## 11. Notices

Confidential and Proprietary

All notices to be given or payments made hereunder shall be in writing and sent by hand, federal express or by registered or certified mail, postage prepaid, addressed to the respective parties at the addresses set forth above. All notices shall be effective upon receipt. Copies of all notices to Licensor or Licensee shall be sent to _____ , attention:

_____.

## 12. Governing Law and Venue

This Agreement and all matters or issues collateral thereto shall be governed by and construed and enforced in accordance with the laws of the State of Massachusetts applicable to contracts made and performed entirely therein. Venue shall be set in the State or Federal Courts of or nearest Cambridge, Massachusetts.

## 13. Entire Understanding

This Agreement contains the entire understanding of the parties hereto relating to the subject matter herein contained, and supersedes any and all prior agreements or understandings relating to the subject matter hereof. This Agreement may not be changed except by a writing signed by the party sought to be charged therewith.

## 14. No Waiver

No waiver by either party, whether express or implied, of any provisions of this Agreement or of any breach or default by either party, shall constitute a continuing waiver or a waiver of any other provision of this Agreement, and no such waiver by either party shall prevent such party from enforcing any and all provisions of this Agreement or from acting upon the same or any subsequent breach or default of the other party. No waiver of any provision hereunder shall be effective unless it is in writing signed by the party against whom enforcement thereof is sought.

## 15. Separability

The provisions set forth in this Agreement shall be considered to be separable and independent of each other. In the event that any provision of this Agreement shall be determined in any jurisdiction to be unenforceable, such determination shall not be deemed to affect the enforceability of any other remaining provision and the parties agree that any court making such a determination is hereby requested and empowered to modify such provision and to substitute for such unenforceable provision such limitation or provision of a maximum scope as the court then deems reasonable and judicially enforceable and the parties agree that such substitute provision shall be as enforceable in said jurisdiction as if set forth initially in this Agreement. Any such substitute provision shall be applicable only in the jurisdiction in which the original provision was determined to be unenforceable.

## 16. Relationship of the Parties

Nothing contained herein shall be construed to place the parties in the relationship of partners or joint venturers unless otherwise provided in writing and neither party shall have the power to bind or obligate the other.

Plastics2Oil License Agreement Page 9 of 9

### 7. Survival

Unless otherwise provided, the obligations of the parties hereto shall survive the termination of the term of this Agreement.

### 8. Arbitration

All claims, demands, disputes, controversies, differences or misunderstandings between or among the parties hereto or any other persons bound hereby arising out of or by virtue of this Agreement, shall be submitted to and determined by arbitration in the City of Clearwater, Florida . If the parties to a dispute arising out of this Agreement are unable to agree on an arbitrator within _____ ( __ ) days after any party shall have given written notice to the other that it desires to submit any issue to arbitration, then the American Arbitration Association shall be designated by any party to appoint an arbitrator and to arbitrate the matter under its rules. The award of the arbitrator shall be made in writing, shall be within the scope of this Agreement, shall not change any of its terms or conditions, shall be binding and conclusive on all parties, and shall include a finding for the payment of the costs of the arbitration proceeding (including reasonable attorneys' fees). It is further agreed that judgment of a court having jurisdiction may be entered upon the award of the arbitrator.

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed as of the day and year first above written.


PLASTIC2OIL LAND, INC.

By: _____


PLASTIC 2 OIL CLEARWATER 1, LLC

By: _____
     Mark Lagos, Manager





ES Resources, LLC
Territory
Pinellas County N. of SR 60

Exit A

eFiling for Case Number: 13-003971-CI

Case Number:13-003971-CI

Electronically Filed 04/11/2013 12:32:20 PM ET

## EXHIBIT D

## RIGHT TO ACQUIRE

This Right to Acquire is made this ___ day of _____, 2009, between JBI, Inc., a Nevada Corporation ("Seller" or "Company"), and _____of _____ ("Buyer" or "PIPE Investor").

### WITNESSETH:

WHEREAS, Seller owns that certain technology enabling the conversion of plastic to oil (herein "P2O"); and

WHEREAS, Seller has offered certain shares of the Company's common stock (the "Common Shares") pursuant to that certain Offering Memorandum dated October 5, 2009 (the "Memorandum"), and referred to herein as "PIPE Offering," in order to finance the acquisition of Pak-It, LLC, a Florida limited liability company,; and

WHEREAS, as part of the PIPE Offering, Seller has agreed to grant to each PIPE investor a limited right to acquire such rights to own or operate a plastic to oil conversion package ("Package") upon such terms and conditions as the Company may from time to time determine in accordance with the terms and provisions hereinafter set forth;

NOW, THEREFORE, in consideration of Ten and no/1 00 ($10.00) Dollars, the mutual promises and covenants herein set forth, and other good and valuable consideration, the parties agree as follows:

1. <u>Recitals</u>. The above recitals are true and correct and made a part hereof.

2. <u>Incorporation of PIPE Offering</u>. The Memorandum is incorporated herein by reference,

3. <u>Grant of Right to Acquire</u>. Seller hereby grants to Buyer the right to acquire, at a discount ("Discount"), by way of license, lease, joint venture, franchise, or such other method as Company may determine, in Company's sole discretion, two land based P2O units constituting one Package, for each $250,000 or 312,500 shares of the stock of the Company purchased pursuant to the Pipe Offering. This grant of Right to Acquire shall only apply to the extent the Company elects to utilize outside funding or otherwise outsource the placement of P20 land based units.

3.1. <u>Discount.</u> The Discount shall be 50% less than the initial licensing fee charged by the Company to third party purchasers as said initial licensing fee is published by the Company from time to time.

4. <u>Costs of Package</u>.   The cost to purchase a Package shall be determined by the

1

Company in its sole discretion but shall not be greater or lesser (other than the Discount) than the price offered to any third party as published by the Company from time to time.

5. <u>Limitation of Right to Acquire</u>.  In order for the Company to enter into a contract to enable a PIPE Investor to acquire a Package, it is understood and agreed as follows:

    a. The Discount provided for herein shall be limited to a single land based Package (2 processors per site) for each $250,000 or 312,500 shares of stock purchased pursuant to the PIPE Offering. Said sites are currently intended to be available in the U.S., Canada, or Europe

    b. The location of sites for which the rights will apply will be based upon population studies undertaken by Company and shall be defined by specific geographic regions such as cities (or parts of cities), counties, states, etc.

    c. The size of a territory will be dependent upon Company studies that determine the availability and cost of the supply of plastics and access to buyers of finished product

        i. For instance, a population base that will support the raw material supply of plastic of at least 10 tons per day is expected to be XX lbs of plastic per person, which results in XX tons per day.

    d. The Buyer must meet certain qualifications and criteria as determined by the Company, in its sole discretion.

6. <u>Nature of Acquisition Rights</u>. The acquisition rights presently being considered for PIPE Investors may include, at the Company's discretion:

    a. Licensing of the know-how and the P2O units
    b. Limited Partnerships
    c. Joint Ventures
    d. Franchising
    e. Leasing

7.     <u>Basic Requirements</u>. In all cases where a PIPE Investor desires to acquire a Package, they will be required to meet certain criteria for P2O owner/operators which will include, but not be limited to:

    a. Availability of capital
    b. Demonstrate that they have equity and/or financing for start-up and operating costs which are expected to be $500,000 to $1.2 million depending upon the location (See Exhibit A for pro-forma start-up costs exclusive of real estate owned or leasing costs)
    c. Own or have leased property or can acquire same which is properly located and is, or can be properly zoned (at least 1 acre)

2

    d.  Have a demonstrated ability to manage or retain experienced managers to manage operations that require industrial processing, security, receiving, shipping, accounting, and the like.

    f.  In all cases the Company will provide the processing units, the know-how, oversee the set-up and start-up of the unit and will provide on-going support and monitoring of performance and quality

          i.  The owner/operator will be required to comply with strict operating guidelines and reporting

          ii.  Minimum revenue and profits levels will be required

         iii.  Machines will be monitored and metered remotely

8. <u>Final Determination.</u> It is hereby agreed and understood that the precise details of the contracts to be offered by the Company have not been finalized and that the Company will make the final determination, in its sole discretion, as to the content and requirements of said Contracts. The contracts will require ongoing fees or share of income to be paid to Company

9. <u>Expiration of Right to Acquire</u>. The right to acquire a Package at the Discount as aforesaid shall automatically terminate twelve months from the date of the first contract offered by the Company to the general public. All PIPE Investors will be notified of said offering date by mail delivery.

10.    <u>Notices</u>. The provisions for the giving of notice shall be the same as set forth in the PIPE Offering and Subscription Agreements of the parties.

11. <u>Binding Effect</u>. This Right to Acquire shall be binding upon and inure to the benefit of the heirs, personal representatives and assigns of the parties hereto; provided, however, any assignee of a PIPE Investor must meet the criteria as finalized by the Company.

12. <u>Entire Agreement</u>. This Agreement, and any instruments and agreements to be executed pursuant to this Agreement, sets forth the entire understanding of the parties hereto with respect to its subject matter, merges and supersedes all prior and contemporaneous understandings with respect to its subject matter and may not be waived or modified, in whole or in part, except by a writing signed by each of the parties hereto. No waiver of any provision of this Agreement in any instance shall be deemed to be a waiver of the same or any other provision in any other instance. Failure of any party to enforce any provision of this Agreement shall not be construed as a waiver of its rights under such provision.

13. <u>Governing Law</u>. This Agreement shall in all respects be governed by and construed in accordance with the laws of the State of Nevada applicable to agreements made and fully to be performed in such state, without giving effect to conflicts of law principles. Venue for any litigation arising out of this Agreement may be in either Nevada or Florida.

14.    <u>Severability</u>. If any provision of this Agreement is held to be invalid or unenforceable by a court of competent jurisdiction, this Agreement shall be interpreted and

3

enforceable as if such provision were severed or limited, but only to the extent necessary to render such provision and this Agreement enforceable.

IN WITNESS WHEREOF, the parties hereto execute this First Right of Refusal on the day and year first above written.

"COMPANY"

WITNESSES:                    **JBI, INC.**

_____

                              By:_____

_____

                              "BUYER"

_____        _____

_____

4

Case Number:13-003971-CI

Electronically Filed 04/11/2013 12:32:20 PM ET

A.

# AREA DEVELOPMENT AGREEMENT

## PLASTIC2OIL LAND, INC.

### and

### AS PTO, LLC

***ELECTRONICALLY FILED 4/15/2013 12:35:19 PM: KEN BURKE, CLERK OF THE CIRCUIT COURT, PINELLAS COUNTY***

eFiling for Case Number: 13-003971-CI

PLASTIC2OIL LAND, INC.
AREA DEVELOPMENT AGREEMENT

TABLE OF CONTENTS

Section Number                                                                  Page Number

1. PREAMBLES AND ACKNOWLEDGMENTS. ...............................................................1
   A. PREAMBLES. ...............................................................................................1
   B. ACKNOWLEDGMENTS. ...............................................................................1

2. DEVELOPMENT RIGHTS AND OBLIGATIONS.........................................................2
   A. TERM OF AGREEMENT ...............................................................................2
   B. DEVELOPMENT RIGHTS OF AREA LICENSEE ...........................................2
   C. LICENSOR'S RESERVATION OF RIGHTS .....................................................3
   D. DEVELOPMENT OBLIGATIONS OF AREA LICENSEE ................................3

3. SITE SELECTION AND GRANT OF LICENSES. ..........................................................3
   A. SITE SELECTION CRITERIA AND ASSISTANCE. ........................................3
   B. GRANT OF LICENSES...................................................................................3

4. DEVELOPMENT FEE....................................................................................................5

5. ORGANIZATION AND MANAGEMENT OF AREA LICENSEE .................................6
   A. ORGANIZATIONAL DOCUMENTSACKNOWLEDGMENTS.........................6
   B. DISCLOSURE OF OWNERSHIP INTERESTS ................................................6
   C. OPERATING PARTNER/MANAGEMENT OF BUSINESS. . ...........................7

6. MARKS ........................................................................................................................7

7. RELATIONSHIP OF THE PARTIES .............................................................................7
   A. INDEPENDENT CONTRACTORS .................................................................7
   B. INDEMNIFICATION .....................................................................................8

8. RESTRICTIVE COVENANTS OF AREA LICENSEE. ...................................................8
   A. CONFIDENTIAL INFORMATION .................................................................8
   B. INFORMATION EXCHANGE........................................................................9
   C. IN-TERM NON-COMPETITION COVENANT ...............................................9

9. TRANSFER OF AGREEMENT .....................................................................................10
   A. TRANSFER BY LICENSOR ..........................................................................10
   B. AREA LICENSEE MAY NOT TRANSFER WITHOUT APPROVAL. ...............10
   C. CONDITIONS FOR APPROVAL OF TRANSFER .............................................11
   D. SPECIAL TRANSFERS .................................................................................12
   E. DEATH OR DISABILITY OF AREA LICENSEE .............................................13
   F. LICENSOR'S RIGHT OF FIRST REFUSAL. ..................................................13
   G. PUBLIC AND PRIVATE OFFERINGS OF SECURITIES ................................14

10. TERMINATION OF AGREEMENT
    A. IMMEDIATE TERMINATION ................................................................................15
    B. TERMINATION UPON NOTICE ...........................................................................15

11. EFFECT OF TERMINATION AND EXPIRATION ..............................................................16
    A. CONTINUING OBLIGATIONS ............................................................................16
    B. POST-TERM NON-COMPETITION COVENANT ...............................................16

12. MISCELLANEOUS ........................................................................................................16
    A. NOTICES. . ...........................................................................................................16
    B. SEVERABILITY/SUBSTITUTION OF VALID PROVISIONS .............................17
    C. WAIVER OF OBLIGATIONS ...............................................................................17
    D. SPECIFIC PERFORMANCE/INJUNCTIVE RELIEF ...........................................17
    E. EXERCISE OF RIGHTS OF PARTIES. . ..............................................................18
    F. COSTS AND ATTORNEYS' FEES .......................................................................18
    G. GOVERNING LAW/CONSENT TO JURISDICTION ..........................................18
    H. LIMITATIONS ON LEGAL ACTIONS ................................................................19
    I. BINDING EFFECT ................................................................................................19
    J. CONSTRUCTION .................................................................................................19

EXHIBIT A - DEVELOPMENT AREA AND SCHEDULE.

EXHIBIT B - AREA LICENSEE AND ITS OWNERS.

-ii-

c.

## AREA DEVELOPMENT AGREEMENT

This Agreement is made and entered into this 12th day of February, 2010 by and between Plastic2Oil Land, Inc. ., a Nevada corporation., ("Licensor"), with its principal place of business located at 500 Technology Square, Cambridge, MA  02139,  and AS PTO, LLC, a Florida limited liability company, ("Area Licensee"), whose principal address is 13355 Seminole Bvld, Seminole Florida 33776.

1.     PREAMBLES AND ACKNOWLEDGMENTS.

   A.     PREAMBLES.

Licensor owns and licenses certain "Intellectual Property" known as Plastic 2 Oil (" P2O"), which includes proprietary technologies, compositions and methods to convert waste plastic to oil as Licensor may determine from time to time. Licensor uses and licenses certain trademarks, service marks and trade dress, including the mark "Plastic 2 Oil", and "P2O", and distinctive machinery designs, and may hereafter adopt, use and license additional or substitute trademarks, service marks and trade dress in connection with the operation of Plastic 2 Oil (collectively, the "Marks"). Licensor has developed and is in the process of developing  a comprehensive system for developing and operating Plastic 2 Oil (the "System") which includes without limitation the Marks, machinery design and layouts, other equipment, formulas and specifications for authorized processing of waste plastic to oil, methods of inventory and operations control and certain business practices and policies, all of which Licensor may improve, further develop or otherwise modify from time to time. The aforementioned Intellectual Property, Marks, and System will be shared with Area Licensee as part of a business plan and implementation agreement to be entered into between Licensor and Area Licensee.

   B.     ACKNOWLEDGMENTS.

Area Licensee has read this Agreement. Area Licensee understands and accepts the terms, conditions and covenants contained in this Agreement as being reasonably necessary to maintain Licensor's high quality standards and the uniformity of those standards at all Plastic 2 Oil locations in order to protect and preserve the goodwill of the Marks and the integrity of the System. Area Licensee recognizes that the recycling industry is highly competitive, with constantly changing market conditions. Area Licensee has conducted an independent investigation of the business contemplated by this Agreement and recognizes that the nature of the Plastic 2 Oil System may change over time, that an investment in the Plastic 2 Oil System involves business risks, and that the success of the venture is largely dependent on Area Licensee's business abilities, efforts and financial resources.

Area Licensee has not received nor relied on any guaranty or assurance, express or implied, as to the revenues, profits or success of the business venture contemplated by this Agreement. Licensor's officers, directors, employees and agents act, and have acted, only in a representative capacity in their dealings with Area Licensee. Area Licensee has not received nor relied on any representations by Licensor or its officers, directors, employees or agents that are contrary to the terms of this Agreement. Area Licensee, and its Owners (as defined in Section 5B), if applicable., represent and warrant to Licensor, as an inducement to its entering into this Agreement, that: (1) in obtaining the rights granted hereunder, neither Area Licensee nor any of its Owners has made any untrue statement of any material fact or has omitted to state any material fact; (2) neither Area Licensee nor any of its Owners have any direct or indirect legal or beneficial interest in any business that may be deemed a Competitive Business (as defined in Section 8C) hereunder, except as otherwise fully and accurately disclosed in the application for the rights hereunder; and (3) the execution and performance of this Agreement will not violate the provisions of any other agreement of Area Licensee or of any of its

Owners.

Area Licensee specifically acknowledges that the success of this venture is reliant on Area Licensee's ability to secure a continuing source of plastic feedstock. In this regard, Area Licensee acknowledges that Licensor has not represented that said plastic feedstock is available in quantities sufficient to insure the viability of this venture, nor has Licensor represented that Licensor will arrange for the provision of plastic feedstock.

2.   DEVELOPMENT RIGHTS AND OBLIGATIONS.

A.   TERM OF AGREEMENT.

Unless sooner terminated in accordance with Section 1A, the term of this Agreement (the "Term") commences 180 days after "validation" as described in Exhibit A, attached hereto and incorporated herein by reference, and expires on the expiration date set forth in Exhibit A, attached hereto and incorporated herein by reference. Area Licensee has no right to renew or extend its rights granted under this Agreement beyond those rights granted in Exhibit A..

B.   DEVELOPMENT RIGHTS OF AREA LICENSEE.

During the Term of this Agreement and provided that Area Licensee and its Affiliates at all times are in full and complete compliance with all the terms and conditions of this Agreement and all other agreements with Licensor or any of its Affiliates (including License Agreements entered into between Licensor and Area Licensee pursuant to this Agreement), and all of the representations and warranties made therein by Area Licensee or any of its Owners or Affiliates are true, correct and complete in all respects at and as of the time given, Licensor will: (1) grant to Area Licensee, in accordance with Section 3 hereof, that cumulative number of licenses for the operation of Plastic 2 Oil sites set forth in Exhibit A, all of which are to be located within the geographical area described in Exhibit A ("the Development Area"); and (2) not operate (directly or through an Affiliate), nor grant the right to operate (except to a Sublicensee),, any Plastic 2 Oil site located within the Development Area, except for: (a) licenses granted to Area Licensee pursuant to this Agreement; (b) Plastic 2 Oil sites or other sites using any part or all of the System and/or Marks at institutional, governmental, municipal or other special locations within the Development Area ("Special Locations"), including without limitation a college or university campus, a hospital, a public transportation facility (e.g., highway rest stop or airport facility), military base, railports, maritime ports, provided, however, if Licensor determines it is practical and appropriate to do so, Licensor shall first offer Area Licensee a license for a Plastic 2 Oil site at such Special Location on terms and conditions Licensor deems appropriate; and (c) sites (whether owned by Licensor or any Affiliate, licensed or licensee of Licensor) that are part of a license system or group of sites with a common identity that are open or under contractual commitment for development at the time that Licensor directly or indirectly acquires such sites and/or the rights of the licensor or licensor of such sites, regardless whether such sites operate (or are converted to operate) using any of the Marks and/or any or all of the System or whether such sites operate under other trademarks service marks or trade dress and use other operating systems.

Subject to the terms of this agreement, Licensee shall be permitted to use Licensor's brands which may include PLASTIC2OIL, P2O, and P2OIL, but only as a trademark identifying the technology employed in the process and not as a trade name. For example, a proper use of the brand would be "ACME Oil Recovery Corporation....using P2O™ Technology." Licensor reserves the right to terminate Licensee's right to use its brands in the event Licensee's use is improper;, Licensee's use would, in the sole opinion of



Licensor, incur a claim of third party infringement; or, as otherwise required by Licensor, to protect the value and goodwill associated with its brands. Licensee agrees to waive any right to challenge the validity of Licensor's brands before the U.S. Patent & Trademark Office or any court of competent jurisdiction.

C. SUB-LICENSEES

Area Licensee is hereby granted the right to sub-license all or a portion of the Plastic 2 Oil sites as set forth on Exhibit A provided any said sub-licensee is approved by Licensor in accordance with the requirements for sub-licensees from time to time established by Licensor in its sole and absolute discretion.

D. LICENSOR'S RESERVATION OF RIGHTS.

Except as otherwise expressly provided in this Agreement Licensor retains all of its rights and discretion with respect to the Marks, the System and Plastic 2 Oil sites, including without limitation, the right to: (1) operate, and grant to others the right to operate, Plastic 2 Oil sites at such locations and on such terms and conditions as Licensor deems appropriate; (2) sell any products or services under the Marks, or under other trademarks, service marks or trade dress, through other channels of distribution; and (3) operate, and grant to others the right to operate, sites identified by trademarks, service marks or trade dress, other than the Marks, pursuant to such terms and conditions as Licensor deems appropriate.

ED.     DEVELOPMENT OBLIGATIONS OF AREA LICENSEE.

Area Licensee shall have open and operating in the Development Area, in accordance with and pursuant to License Agreements, that cumulative number of Plastic 2 Oil sites set forth in Exhibit A by the corresponding date set forth therein ("Development Schedule"). Time is of the essence in this Agreement, and Licensor shall have no obligation under any circumstances to extend the Development Schedule. Area Licensee's failure to develop and operate Plastic 2 Oil sites in accordance with the Development Schedule shall be a material breach of this Agreement; however, Licensor's right to terminate this Agreement in accordance with Section 10 shall be the sole and exclusive remedy of Licensor for Area Licensee's failure to meet the Development Schedule.

3.      SITE SELECTION AND GRANT OF LICENSES.

A.      SITE SELECTION CRITERIA AND ASSISTANCE.

Licensor will furnish Area Licensee with Licensor's standard site selection criteria for Plastic 2 Oil sites, as in effect from time to time. Licensor may also provide such on-site evaluation of sites proposed pursuant hereto as Licensor deems necessary or appropriate.

B.      GRANT OF LICENSES.

Licensor will grant licenses to Area Licensee for the operation of that cumulative number of Plastic 2 Oil sites set forth in Exhibit A and located within the Development Area, subject to the following conditions:

(1)     Area Licensee shall submit to Licensor, in accordance with procedures Licensor may establish from time to time, a complete site report containing all information that Licensor may reasonably require for each Plastic 2 Oil site that Area Licensee proposes to develop and operate and that Area Licensee in good faith believes to conform to



Licensor's then current standard site selection criteria for Plastic 2 Oil sites.

(2)     Licensor will approve or disapprove each site for which Area Licensee submits to Licensor a complete site report in accordance with Section 3B(1) and if Licensor approves such site, Licensor will do so by delivering written notice thereof pursuant to a standard Site Approval Form. Licensor's Site Approval Form, duly executed by Licensor, shall be the sole and exclusive means by which Licensor shall approve a proposed site and no other direct or indirect representation, approval or acceptance, whether in writing or orally, by any officer, director, employee or agent of Licensor, shall be effective or bind Licensor. Licensor will use all reasonable efforts to make such site approval determination in a reasonably timely manner, and, if the site is approved, deliver such Site Approval Form to Area Licensee within thirty (30) days after Licensor's receipt of the complete site report and other materials it has requested, containing all information Licensor requires. In determining whether to approve or disapprove a site proposed by Area Licensee, Licensor may consider such factors as Licensor, in its sole discretion, deems appropriate including, without limitation, the general location and neighborhood, demographic information, traffic patterns, access, visibility, size, condition, configuration, appearance, other physical characteristics of the site, location of other similar establishments (including other Plastic 2 Oil sites) and likelihood of permitting by government agencies. NEITHER LICENSOR'S APPROVAL OF A PROPOSED SITE, NOR ANY INFORMATION COMMUNICATED TO AREA LICENSEE REGARDING LICENSOR'S STANDARD SITE SELECTION CRITERIA OR THE PROPOSED SITE, SHALL CONSTITUTE A WARRANTY OR REPRESENTATION OF ANY KIND, EXPRESS OR IMPLIED, AS TO THE SUITABILITY OF THE PROPOSED SITE FOR A PLASTIC 2 OIL SITE OR FOR ANY OTHER PURPOSE. LICENSOR'S APPROVAL OF A PROPOSED SITE MERELY SIGNIFIES THAT LICENSOR IS WILLING TO GRANT A LICENSE FOR A PLASTIC 2 OIL SITE FOR SUCH SITE. AREA LICENSEE ACKNOWLEDGES THAT APPLICATION OF CRITERIA WHICH HAVE BEEN RELEVANT WITH RESPECT TO OTHER SITES MAY NOT BE PREDICTIVE OF THE POTENTIAL FOR ALL SITES AND THAT, SUBSEQUENT TO THE APPROVAL OF THE SITE, CHANGES IN RELEVANT FACTORS SUCH AS DEMOGRAPHICS, AVAILABILITY OF PLASTIC FEEDSTOCK, AND COMPETITION FROM OTHER SIMILAR ESTABLISHMENTS, MAY ALTER THE POTENTIAL OF USING THE SITE FOR A PLASTIC 2 OIL SITE. THESE FACTORS ARE BEYOND LICENSOR'S CONTROL, AND LICENSOR IS NOT RESPONSIBLE FOR THE FAILURE OF THE SITE TO MEET AREA LICENSEE'S EXPECTATIONS AS TO POTENTIAL REVENUES. AREA LICENSEE'S DETERMINATION TO DEVELOP A PLASTIC 2 OIL SITE AT ANY SITE IS BASED SOLELY ON HIS OWN INDEPENDENT INVESTIGATION OF THE SUITABILITY OF SUCH SITE FOR A PLASTIC 2 OIL SITE.

(3)     Licensor also may require that Area Licensee and its Owners furnish to Licensor financial statements (historical and pro forma), statements of the sources and uses of capital funds, budgets and other information regarding Area Licensee, its Owners and the development and operation of any Plastic 2 Oil site proposed by Area Licensee. All such requested information shall be verified by Area Licensee and its Owners as being complete and accurate in all respects, shall be submitted in accordance with Licensor's requirements, and will be relied on by Licensor in determining whether to grant a license for the proposed Plastic 2 Oil site. Licensor may refuse to grant Area Licensee a license for a Plastic 2 Oil site if Area Licensee fails to demonstrate sufficient financial and management capabilities to properly develop and operate the proposed Plastic 2 Oil site. Licensor will evaluate such financial and management capabilities in accordance with standards that Licensor determines in Licensors sole discretion.

(4)     Upon Licensor's approval of a proposed site, and provided Area Licensee has demonstrated the requisite financial and management capabilities, all as above provided, Licensor shall offer Area Licensee a license to operate a Plastic 2 Oil site at the proposed site by delivering to



Area Licensee the then-current form of standard license agreement, together with all standard documents ancillary thereto (including, but not limited to, exhibits, riders, collateral assignments of leases, mortgages, UCC Financing Statements, Owner guarantees (if any)), and other related documents) that Licensor then customarily uses in granting licenses for the operation of Plastic 2 Oil sites in the state in which the Plastic 2 Oil site to be operated pursuant to such license agreement is to be located ("the License Agreement"), modified as necessary to reflect the provisions of this Section 3. Such License Agreement shall be executed by Area Licensee and its Owners and returned to Licensor not earlier than five (5) business days and not later than fifteen (15) business days after Licensor's delivery thereof to Area Licensee, with payment of the initial license fee required thereunder. If Licensor does not receive such fully executed License Agreement and payment of the initial license fee within the period of time all stated above, Licensor may revoke its offer to grant Area Licensee a license to operate a Plastic 2 Oil site at the proposed site and may revoke its approval of the proposed site.

(5)     The initial license fee payable for each Plastic 2 Oil site required to be developed by Area Licensee pursuant to this Agreement shall be Two Hundred Thousand Dollars ($200,000.00). The Development Fee payable pursuant to Section 4 may be applied, as provided in Exhibit A, against the initial license fees payable in accordance herewith.

4.     DEVELOPMENT FEE.

Concurrently with the execution of this Agreement, Area Licensee shall pay to Licensor a Development Fee in the amount set forth in Exhibit A, which fee shall be deemed fully earned by Licensor upon execution of this Agreement. Except as otherwise explicitly provided herein, the Development Fee shall be non-refundable.

5.     ORGANIZATION AND MANAGEMENT OF AREA LICENSEE.

A.     ORGANIZATIONAL DOCUMENTS.

If Area Licensee is, or at any time becomes, a partnership, limited liability company (LLC) or a corporation, Area Licensee and each of its Owners represents, warrants and agrees that: (1) Area Licensee is a new LLC, corporation or partnership, duly organized and validly existing under the laws of the state of its organization, and, if a foreign corporation or partnership, is duly qualified to transact business in the state(s) in which the Development Area is located; (2) Area Licensee has the authority to execute, deliver and perform its obligations under this Agreement; (3) true and complete copies of the articles of incorporation or organization, partnership agreement, bylaws, operating agreements, subscription agreements, shareholders or buy-sell agreements, voting trust agreements and all other documents relating to the ownership, organization, capitalization, management or control of Area Licensee have been delivered to Licensor; (4) the articles of incorporation or organization, operating agreement, partnership agreement or other organizational documents or instruments that are required by law shall provide that its activities shall be restricted to those necessary solely for the development, ownership and operation of Plastic 2 Oil sites in accordance with this Agreement and in accordance with License Agreements entered into with Licensor or any of its Affiliates; (5) the articles of incorporation or organization, operating agreement, partnership agreement or other organizational documents recite that the issuance and assignment, transfer or pledge of any direct or indirect legal or beneficial interest therein is restricted by the terms of this Agreement and the terms of License Agreements executed pursuant hereto; and (6) all certificates representing direct or indirect legal or beneficial ownership interests in such LLC, partnership or corporation now or hereafter issued bear a legend in conformity with applicable law reciting or referring to such restrictions.

B.    DISCLOSURE OF OWNERSHIP INTERESTS.

Each person or entity who at any time has a direct or indirect legal or beneficial ownership interest in Area Licensee is an "Owner" of Area Licensee for purposes of this Agreement. Area Licensee and each of its Owners represents, warrants and agrees (i) that Exhibit B to this Agreement, which is incorporated herein by reference, correctly identifies each and every Owner, officer and director,; (ii) that Exhibit B completely and accurately describes the nature and extent of each Owner's interest in Area Licensee,; and (iii) that updated Exhibits B shall be furnished promptly to Licensor, so that Exhibit B (as so revised and signed by Area Licensee) is at all times current, complete and accurate. Each person who is or becomes an Owner shall execute an agreement in form prescribed by Licensor undertaking to be bound jointly and severally by the terms of this Agreement and any ancillary agreements Area Licensee enters into with Licensor, including License Agreements. Each Owner shall be a natural person acting in his individual capacity, unless otherwise approved by Licensor.

C.    OPERATING PARTNER/MANAGEMENT OF BUSINESS.

If Area Licensee is, or at any time becomes, a partnership, LLC or corporation, Area Licensee shall designate in Exhibit B the "Operating Partner"", a natural person approved by Licensor, who shall demonstrate that it does: (a) own and control, or have the right to own and control (subject to conditions reasonably acceptable to Licensor), not less than ten percent (10%) of the equity and voting rights of Area Licensee; (b) have the authority to bind Area Licensee regarding all operational decisions with respect to its Plastic 2 Oil sites; and (c) have will complete Licensor's initial training program to Licensor's satisfaction..

Area Licensee (or the Operating Partner) shall exert his full-time and best efforts on the development and operation of Plastic 2 Oil sites owned by Area Licensee and shall not engage in any other business or activity, directly or indirectly, that requires substantial management responsibility or time commitments or otherwise may conflict with Area Licensee's obligations hereunder. Each Plastic 2 Oil site licensed pursuant hereto shall be managed continually by an on-site general manager who has completed Licensor's training program to Licensor's satisfaction.

6.    MARKS.

Area Licensee acknowledges that Licensor owns the Marks and that Area Licensee's right to use the Marks will be derived solely from License Agreements entered into between Area Licensee and Licensor. Area Licensee shall not use any Mark as part of any corporate or legal business name or in any other manner not explicitly authorized in writing by Licensor.

7.    RELATIONSHIP OF THE PARTIES.

A.    INDEPENDENT CONTRACTORS.

Neither this Agreement nor the dealings of the parties pursuant to this Agreement shall create any fiduciary relationship or any other relationship of trust or confidence between the parties hereto. Licensor and Area Licensee, as between themselves, are and shall be independent contractors.

If applicable law shall imply a covenant of good faith and fair dealing in this Agreement, the parties hereto agree that such covenant shall not imply any rights or obligations that are inconsistent with a fair construction of the terms of this Agreement. Additionally, if applicable law shall imply such covenant, Licensor and Area Licensee acknowledge and agree that: (1) this Agreement (and the relationship of the parties which is inherent from this agreement) grants Licensor the discretion to make

decisions, take actions and/or refrain from taking actions not inconsistent with its explicit rights and obligations hereunder that may favorably or adversely affect the interests of Area Licensee; (2) Licensor shall use its business judgment in exercising such discretion based on its assessment of its own interests and balancing those interests against the interests of the owners of Plastic 2 Oil sites generally (including Licensor, and its Affiliates and licensees), and specifically without considering the individual interests of Area Licensee or any other particular licensee of Licensor; (3) Licensor shall have no liability to Area Licensee for the exercise of its discretion in this manner, so long as such discretion is not exercised in bad faith toward Area Licensee; and (4) in absence of such bad faith, no trier of fact in any legal action or arbitration proceeding shall substitute its judgment for the business judgment so exercised by Licensor.

Nothing contained in this Agreement, or arising from the conduct of the parties hereunder, is intended to make either party a general or special agent, joint venturer, partner or employee of the other for any purpose whatsoever. Area Licensee shall conspicuously identify itself in all dealings with customers, lessors, contractors, suppliers, public officials, personnel of Area Licensee and others as the owner of development rights granted by Licensor and shall place such other notices of independent ownership on such forms, business cards, stationery, advertising and other materials as Licensor may require from time to time.

Area Licensee shall make no express or implied agreements, warranties, guarantees or representations or incur any debt in the name or on behalf of Licensor or represent that the relationship of the parties hereto is anything other than that of independent contractors. Licensor shall not be obligated by or have any liability under any agreements made by Area Licensee with any third party or for any representations made by Area Licensee to any third party. Licensor shall not be obligated for any damages to any person or property directly or indirectly arising out of the operation of Area Licensee's business hereunder.

Nothing contained in this paragraph will prevent the parties from entering into a general or special agent arrangement, joint venture, partner or employee relationship pursuant to separate agreements.

B.    INDEMNIFICATION.

Area Licensee shall indemnify, defend and hold harmless Licensor, its Affiliates and their respective stockholders, directors, officer, employees, consultants, agents, attorneys, accountants, successors and assigns against, and reimburse them for, any claim, liability, obligation, actual and consequential damages or taxes asserted against or imposed on any of the foregoing indemnified parties contrary to the provisions of Section 7 and any claim or liability directly or indirectly arising from the development or operation of any of Area Licensee's Plastic 2 Oil sites. Licensor has the right to defend and/or settle any such matter in such manner as it deems appropriate, in its sole discretion, and without the consent of Area Licensee, and Area Licensee shall reimburse each of the foregoing indemnified parties for all costs reasonably incurred in defending any such matter, including, without limitation, reasonable attorneys' fees. This section shall continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement.

8.    RESTRICTIVE COVENANTS OF AREA LICENSEE.

A.    CONFIDENTIAL INFORMATION.

Licensor possesses certain proprietary and confidential information (the "Confidential Information") relating to the development and operation of Plastic 2 Oil sites, including without limitation: (1) ingredients, formulas, and methods of processing; (2) site selection criteria for Plastic 2

Oil sites and plans and specifications for the development of Plastic 2 Oil sites; (3) sales, marketing and advertising programs and techniques for Plastic 2 Oil sites; (4) knowledge of specifications for, and suppliers of, certain products, materials, supplies and equipment; (5) knowledge of operating results and financial performance of Plastic 2 Oil sites, other than those owned by Area Licensee; and (6) methods of inventory control, storage, product handling and management of Plastic 2 Oil sites. Licensor will disclose portions of its Confidential Information to Area Licensee solely for its use in connection with its obligations hereunder and pursuant to License Agreements.

The Confidential Information is proprietary and includes Licensor's trade secrets. During the Term and thereafter, Area Licensee shall:   (1) not acquire any interest in the Confidential Information; (2) not use the Confidential Information in any other business or capacity, Area Licensee acknowledging that any such use would constitute an unfair method of competition; (3) exert its best efforts to maintain the confidentiality of the Confidential Information; (4) not make unauthorized copies of any portion of the Confidential Information disclosed in written, electronic or other tangible form; and (5) adopt and implement all reasonable procedures that Licensor prescribes from time to time to prevent unauthorized use or disclosure of the Confidential Information, including without limitation, restrictions on disclosure thereof to, and the use of nondisclosure agreements with, Area Licensee's officers, directors and management employees and the delivery of such agreements to Licensor.

Notwithstanding anything to the contrary contained in this Agreement, the restrictions on Area Licensee's disclosure and use of Confidential Information shall not apply to: (1) information, processes or techniques which are or become generally known in the oil, plastic or recycling industry, other than through disclosure (whether deliberate or inadvertent) by Area Licensee, provided Area Licensee shall have obtained Licensor's prior written consent, which shall not be unreasonably withheld; and (2) disclosure of the Confidential Information in judicial or administrative proceedings to the extent that Area Licensee is legally compelled to disclose such information, provided Area Licensee shall have given Licensor prior written notice of such required disclosure and shall have used its best efforts, and afforded Licensor the opportunity, to obtain an appropriate protective order or other assurance satisfactory to Licensor of confidential treatment for the information required to be disclosed.

B.   INFORMATION EXCHANGE.

Area Licensee acknowledges the importance to all Plastic 2 Oil sites of exchanging ideas, concepts, methods and techniques for a similar recyclingbusiness conceived or developed by Area Licensee and/or its officers, directors and employees. Accordingly, Area Licensee agrees to fully and promptly disclose to Licensor all such ideas, concepts, methods and techniques, and if adopted by Licensor for Plastic 2 Oil sites, Licensor shall have the right, without charge, to use and authorize others the right to use such ideas, concepts, methods and techniques.

C.   IN-TERM NON-COMPETITION COVENANT.

During the Term, neither Area Licensee nor any of Area Licensee's Owners shall, without Licensor's prior written consent:

(1)     directly or indirectly (including, without limitation, through his or their Immediate Families, as defined below) own any legal or beneficial interest in, or render services for or give advice to: (a) any Competitive Business (as defined below) located anywhere; or (b) any entity located anywhere which grants licenses, licenses or other interests to others to operate any Competitive Business; or

(2)     divert or attempt to divert any supplier, business or customer of Plastic 2 Oil sites to any competitor by inducement or otherwise, or do anything injurious or prejudicial to the goodwill associated

with the Marks or the System.

The foregoing restrictions shall be inapplicable to: (1) the ownership or operation of other Plastic 2 Oil sites under license agreements with Licensor; and (2) the ownership of shares of a class of securities that are listed on a stock exchange or traded on the over-the-counter market and represent less than five percent (5%) of that class of securities. The phrase "Competitive Business" means any business that requires waste plastic items or sells oil used by Plastic 2 Oil sites or any other business that is the same as or similar to the Plastic 2 Oil site concept, as it evolves or changes over time. The phrase "Immediate Family" means spouse, parents, brothers, sisters and children, whether natural or adopted.

9.     TRANSFER OF AGREEMENT.

A.     TRANSFER BY LICENSOR.

This Agreement is fully transferable by Licensor, whether by operation of law or otherwise, and shall inure to the benefit of any transferee or other legal successor to Licensor's interest herein.

B.     AREA LICENSEE MAY NOT TRANSFER WITHOUT APPROVAL.

The rights and duties of Area Licensee under this Agreement are personal to Area Licensee or, if Area Licensee is a corporation or partnership, its Owners. Accordingly, neither Area Licensee nor any of its Owners may Transfer the Development Rights (as defined below) without Licensor's prior written approval and without complying with all of the terms and conditions set forth in this Section 9. Any transfer without such approval or compliance shall constitute a breach of this Agreement and shall be void and of no force or effect.

The phrase "Transfer the Development Rights" or words of similar import shall include the voluntary, involuntary, direct or indirect sale, assignment, transfer, license, sublicense, collateral assignment, grant of a security, collateral or conditional interest, inter-vivos transfer, testamentary disposition or other disposition of this Agreement, any interest in or right under this Agreement or any form of ownership interest in Area Licensee, including without limitation: (1) any transfer, redemption or issuance of any legal or beneficial ownership interest in the capital stock of, or a partnership interest in, or a membership interest in, Area Licensee or of any interest convertible to or exchangeable for capital stock of, or a partnership or membership interest in, Area Licensee; (2) any merger or consolidation of Area Licensee, whether or not Area Licensee is the surviving corporation; (3) any transfer in or as a result of a divorce, insolvency, corporate or partnership dissolution proceeding or otherwise by operation of law; or (4) any transfer upon the death of Area Licensee or any Owner of Area Licensee by will, declaration of or transfer in trust or under the laws of intestate succession.

C.     CONDITIONS FOR APPROVAL OF TRANSFER.

Provided Licensor shall not have exercised its rights under Subsection 9F hereof, Licensor shall not unreasonably withhold its approval of a Transfer of the Development Rights that meets all of the reasonable restrictions, requirements and conditions Licensor may impose on the transfer, the transferor(s) and/or the transferee(s), including, without limitation, the following:

(1)     Area Licensee and its Owners and Affiliates shall be in compliance with the terms and conditions of this Agreement and all License Agreements executed pursuant hereto;

(2)     the proposed transferee, or its owners (if the proposed transferee is a corporation, limited liability company, or partnership), must be natural persons acting in their individual capacities



~~who are of good character and reputation, who must have sufficient business experience, aptitude and~~ financial resources to develop Plastic 2 Oil sites pursuant to this Agreement, and who must otherwise meet Licensor's then applicable standards for area licensees of Plastic 2 Oil sites;

(3)   the proposed transferee may not be an entity, or be affiliated with an entity, that is required to comply with the Securities Exchange Act of 1934, as amended;

(4)   the transferee and its owners must agree to be bound by all of the terms and conditions of this Agreement for the remainder of its term;

(5)   the transferee must acquire, in a concurrent transaction, all of the rights of Area Licensee and its Owners and Affiliates under all license agreements for Plastic 2 Oil sites executed by Area Licensee or its Owners or Affiliates pursuant to this Agreement or pursuant to any other development or similar agreement with Licensor;

(6)   Area Licensee or the transferee must pay Licensor a transfer fee, in place of any transfer fee under any License Agreement, in an amount equal to Twenty-Five Thousand Dollars ($25,000), plus One Thousand Dollars ($1,000) for each Plastic 2 Oil site for which a License Agreement shall have been executed pursuant hereto;

(7)   except to the extent limited or prohibited by applicable law, Area Licensee and its Owners, Affiliates, heirs, executors and assigns if applicable, must execute a general release, in form and substance satisfactory to Licensor, of any and all claims against Licensor, its Affiliates and their respective stockholders, officers, directors, employees, agents, consultants, attorneys, accountants, successors and assigns;

(8)   Area Licensee and its Owners must execute a noncompetition covenant, in form and substance satisfactory to Licensor, in favor of Licensor and the transferee agreeing that, for a period of two (2) years commencing on the effective date of the transfer,, Area Licensee and its Owners will not directly or indirectly (including without limitation through his or their Immediate Families) own any legal or beneficial interest in, or render services or give advice to: (a) any Competitive Business that is operating within the Development Area; (b) any Competitive Business that is operating within a twenty (20) mile radius of any Plastic 2 Oil site in operation or under construction, wherever located, as of the effective date of such transfer; or (c) any entity which grants licenses, franchises or other interests to others to operate any Competitive Business. The foregoing restrictions shall be inapplicable to: (i) the ownership or operation of any other Plastic 2 Oil sites under license agreements with Licensor; and (ii) the ownership of shares of a class of securities that are listed on a stock exchange or traded on the over-the-counter market and represent less than five percent (5%) of that class of securities; and

(9)   Area Licensee and its Owners and Affiliates shall execute such other documents as shall be reasonably required by Licensor to protect Licensor's rights under this Agreement and any License Agreements.

Licensor's approval of a Transfer of the Development Rights shall not constitute: (1) a representation by Licensor as to the fairness of the terms of any agreement or arrangement between Area Licensee or its Owners and the transferee or as to the prospects of success by the transferee; or (2) a waiver of any claims by Licensor against Area Licensee or its Owners or a waiver of Licensor's right to demand the transferee's exact compliance with this Agreement, all of which are deemed to survive any Transfer of the Development Rights unless specifically waived by Licensor..

D.   SPECIAL TRANSFERS.

Neither Section 9F nor Sections 9C(2), (6), or (7) shall apply to any Transfer of the Development Rights among any of the then current Owners of Area Licensee. Neither Section 9F nor Section 9C(6) or (7) shall apply to any Transfer of the Development Rights to any member of the Immediate Family of Area Licensee (if an individual) or a then current Owner of Area Licensee (if a corporation or partnership). Upon thirty (30) days' prior written notice to Licensor, Area Licensee (if an individual, limited liability company or partnership) may transfer this Agreement, in conjunction with a transfer of all of the License Agreements executed pursuant hereto and all of the assets of the Plastic 2 Oil sites operated pursuant thereto, by an agreement in form and substance approved by Licensor in its sole and absolute discretion to a corporation which conducts no business other than the development and operation of Plastic 2 Oil sites and of which Licensee owns and controls all of the equity and voting power of all issued and outstanding capital stock. None of the foregoing assignments shall relieve Licensee or its Owners of their obligations hereunder and Licensee and its Owners shall remain jointly and severally liable for all obligations hereunder.

E.   DEATH OR DISABILITY OF AREA LICENSEE.

Upon the death or permanent disability of Area Licensee or the Operating Partner of Area Licensee, the executor, administrator, conservator, guardian or other personal representative of such person shall transfer (including, without limitation, by bequest or inheritance) his interest in this Agreement or his interest in Area Licensee to a third party approved by Licensor in accordance with all of the terms and conditions contained in Sections 9B, 9C and 9D (as applicable) within a reasonable period of time, not to exceed nine (9) months from the date of death or permanent disability. Failure to transfer the interest in this Agreement or such interest in Area Licensee within said period of time shall constitute a material breach of this Agreement. The term "permanent disability" shall mean a mental or physical disability, impairment or condition that is reasonably expected to prevent or actually does prevent Area Licensee, the Operating Partner of Area Licensee or an Owner of a controlling interest in Area Licensee from managing and/or supervising Plastic 2 Oil sites under License Agreements for a period of ninety (90) days or more from the onset of such disability, impairment or condition.

F.   LICENSOR'S RIGHT OF FIRST REFUSAL.

If Area Licensee or any of its Owners desires to Transfer the Development Rights for legal consideration, Area Licensee or such Owner shall obtain a bona fide, executed written offer and earnest money deposit in the amount of at least five percent (5%) of the offering price from a responsible and fully disclosed purchaser and shall deliver immediately to Licensor a complete and accurate copy of such offer.   If the offeror proposes to buy any other property or rights from Area Licensee or any of its Owners or Affiliates (other than rights under area development and license agreements for Plastic 2 Oil sites), the proposal for such property or rights must be set forth in a separate, contemporaneous offer that is disclosed to Licensor, and the price and terms of purchase offered to Area Licensee or its Owners for the Transfer of the Development Rights shall reflect the bona fide price offered therefore and not reflect any value for any other property or rights.

Licensor shall have the option, exercisable by written notice delivered to Area Licensee or its Owners within thirty (30) days from the date of delivery of a complete and accurate copy of such offer to Licensor, to purchase such interest for the price and on the terms and conditions contained in such offer, provided that: (1) Licensor may substitute cash for any form of payment proposed in such offer; (2) Licensor's credit shall be deemed equal to the credit of any proposed purchaser; and (3) Licensor shall have not less than ninety (90) days from the option exercise date to consummate the transaction. Licensor shall have the right to investigate and analyze the business, assets and liabilities and all other matters Licensor deems necessary or desirable in order to make an informed investment decision with respect to the fairness of the terms of the right of first refusal. Licensor may conduct such investigation and

analysis in any manner it reasonably deems appropriate and Area Licensee and its Owners shall fully cooperate with Licensor in connection therewith.

If Licensor exercises its option to purchase, Licensor shall be entitled to purchase such interest subject to all representations and warranties, closing documents and indemnities as Licensor reasonably may require, including, without limitation, representations and warranties as to the ownership and condition of and title to shares of capital stock or partnership interests and/or assets, the validity and status of contracts and leases and the extent of liabilities, contingent or otherwise, of the corporation or partnership whose shares of capital stock or partnership interests are being purchased.

If Licensor does not exercise its option to purchase, Area Licensee or its Owners may complete the sale to such offeror pursuant to and on the exact terms of such offer, subject to Licensor's approval of the transfer as provided in Sections 9B and 9C, provided that if the sale to such offeror is not completed within ninety (90) days after delivery of such offer to Licensor, or if there is a material change in the terms of the offer, Licensee shall promptly notify Licensor thereof and Licensor shall have an additional option to purchase (on the terms set forth herein) during the thirty (30) day period following Area Licensee's notification of the expiration of the ninety (90) day period or a material change to the terms of the offer.

    G.    PUBLIC AND PRIVATE OFFERINGS OF SECURITIES.

Neither Area Licensee nor any of its Owners shall issue or sell, or offer to issue or sell, any securities of Area Licensee or an Affiliate of Area Licensee, regardless of whether such sale or offer would be required to be registered pursuant to the provisions of the Securities Act of 1933, as amended, or the securities laws of any other jurisdiction, without obtaining Licensor's prior written consent and complying with all of Licensor's requirements and restrictions concerning use of information about Licensor and its Affiliates. Notwithstanding anything to the contrary contained in this Agreement, under no circumstances shall Area Licensee or any of its Owners issue or sell securities of Area Licensee or any of its Affiliates if: (1) such securities would be required to be registered pursuant to the Securities Act of 1933, as amended, or such securities would be owned by more than thirty-five (35) persons; or (2) after such issuance or sale, Area Licensee or such Affiliate would be required to comply with the reporting and information requirements of the Securities Exchange Act of 1934, as amended.

10.    TERMINATION OF AGREEMENT.

    A.    IMMEDIATE TERMINATION.

Area Licensee shall be deemed in material breach of this Agreement, and this Agreement shall automatically terminate without notice, if Area Licensee shall become insolvent by reason of its inability to pay its debts as they mature; shall be adjudicated bankrupt or insolvent; shall file a petition in bankruptcy, reorganization or similar proceeding under the bankruptcy laws of the United States or shall have such a petition filed against it which is not discharged within thirty (30) days; or if a receiver or other custodian, permanent or temporary, is appointed for the business, assets, or property of Area Licensee; or if Area Licensee requests the appointment of a receiver or makes a general assignment for the benefit of creditors; or if final judgment against Area Licensee in the amount of Twenty-Five Thousand Dollars ($25,000) or more remains unsatisfied of record for thirty (30) days or longer; or if the bank accounts, property or accounts receivable of Area Licensee are attached; or if execution is levied against the business or property of Area Licensee; or if suit is filed to foreclose any lien or mortgage against any of the assets of Area Licensee and such suit is not dismissed within thirty (30)

days; or if Area Licensee voluntarily dissolves or liquidates or has a petition filed for corporate or partnership dissolution and such petition is not dismissed within thirty (30) days.

B.     TERMINATION UPON NOTICE.

Licensor may terminate this Agreement, effective upon delivery of notice of termination to Area Licensee:

(1)     if Area Licensee fails to meet the Development Schedule;

(2)     if Area Licensee or any Owner or Affiliate of Area Licensee makes an unauthorized Transfer of the Development Rights;

(3)     if Area Licensee or any Owner or Affiliate of Area Licensee has made any material misstatement or omission in the application for the development rights conferred by this Agreement or in any other information provided pursuant to this Agreement or is or has been convicted of, or pleads or has pleaded no contest to, a felony or other crime or offense that Licensor reasonably believes may adversely affect the goodwill associated with the Marks;

(4)     if Area Licensee or any Owner or Affiliate of Area Licensee makes any unauthorized use of the Marks or any unauthorized use or disclosure of the Confidential Information;

(5)     if Area Licensee or any Owner or Affiliate of Area Licensee fails to comply with any other provision of this Agreement and does not correct such failure within thirty (30) days after written notice of such failure to comply is delivered to Area Licensee;

(6)     if Area Licensee or any Owner or Affiliate of Area Licensee is in breach of any License Agreement such that Licensor has the right to terminate the License Agreement, whether or not Licensor elects to exercise its right to terminate the License Agreement; or

(7)     if Licensor determines that any federal or applicable state legislation, regulation or rule, which is enacted, promulgated or amended after the date hereof, may have an adverse effect on Licensor's rights, remedies or discretion in licensing Plastic 2 Oil sites.

Area Licensee acknowledges that Licensor shall have no obligation whatsoever to refund any portion of the Development Fee upon any termination, except that Licensor will refund the unapplied portion of the Development Fee paid pursuant to Section 4 hereof in the event of a termination pursuant to Subsection B(7).

11.     EFFECT OF TERMINATION AND EXPIRATION.

A.     CONTINUING OBLIGATIONS.

All obligations of Licensor and Area Licensee and its Owners under this Agreement which expressly or by their nature survive the expiration or termination of this Agreement shall continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement until they are satisfied in full or by their nature expire.

B.     POST-TERM NON-COMPETITION COVENANT.

Area Licensee and each of its Owners agree that, upon termination or expiration of this



Agreement for a period of two (2) years commencing on the effective date of termination or expiration, neither Area Licensee nor any of its Owners shall directly or indirectly (including, without limitation, through a member of his or their Immediate Families) own a legal or beneficial interest in or render services or give advice to:

        (1)    any Competitive Business operating within the Development Area;

        (2)    any Competitive Business operating within a radius of twenty (20) miles of any Plastic 2 Oil site in operation or under construction on the effective date of termination or expiration; or

        (3)    any entity which grants licenses, franchises or other interests to others to operate any Competitive Business.

If Area Licensee or any of its Owners fails or refuses to abide by any of the foregoing covenants, and Licensor obtains enforcement thereof in a judicial or arbitration proceeding, the applicable covenant shall be in effect and continue for a period of time expiring two (2) years after the date such person commences compliance with the order enforcing the applicable covenant. Licensee (or each of its Owners) expressly acknowledges that he possesses skills and abilities of a general nature and has other opportunities for exploiting such skills, so that enforcement of the covenants contained in this Section 11B will not deprive him of his personal goodwill or ability to earn a living.

The restrictions of this Subsection 11B shall not be applicable to the ownership of shares of a class of securities listed on a stock exchange or traded on the over-the-counter market that represent less than five percent (5%) of the number of shares of that class of securities issued and outstanding or the ownership or operation of any other Plastic 2 Oil sites under license agreement with Licensor.

12.    MISCELLANEOUS.

A.    NOTICES.

All notices, requests and reports permitted or required to be made by the provisions of this Agreement shall be in writing and shall be deemed delivered: (1) at the time delivered by hand to the recipient party (or to an officer, director or partner of the recipient party); (2) on the same date of the transmission by facsimile, telegraph or other reasonably reliable electronic communication system; (3) one (1) business day after being placed in the hands of a commercial courier service for guaranteed overnight delivery; or (4) three (3) business days after placement in the United States Mail by Registered or Certified Mail, Return Receipt Requested. postage prepaid. Such notices, requests and reports shall be sent to the addresses identified in this Agreement unless and until a different address has been designated by appropriate written notice to the other party.

B.    SEVERABILITY/SUBSTITUTION OF VALID PROVISIONS.

Every part of this Agreement shall be considered severable. If for any reason any part of this Agreement is held to be invalid., that determination shall not impair such other parts of this Agreement as may remain otherwise intelligible. If any covenant herein which restricts competitive activity is deemed unenforceable by virtue of its scope in terms of geographical area, type of business activity prohibited and/or length of time, but could be enforceable by reducing any part or all thereof, Area Licensee and Licensor agree that the same shall be enforced to the fullest extent permissible under applicable laws and public policies.

If any applicable law or rule of any jurisdiction requires a greater prior notice of the termination than is required hereunder, or the taking of some other action not required hereunder, the prior notice and/or other action required by such law or rule shall be substituted for the comparable provisions hereof.

C.    WAIVER OF OBLIGATIONS.

Licensor and Area Licensee may by written instrument unilaterally waive or reduce any obligation of the other under this Agreement. Any waiver granted by Licensor shall be without prejudice to any other rights Licensor may have, will be subject to continuing review by Licensor and may be revoked, in Licensor's sole discretion, at any time and for any reason, effective upon delivery to Area Licensee of ten (10) days' prior written notice. Licensor and Area Licensee shall not be deemed to have waived any right, power or option reserved by this Agreement or be deemed to have modified this Agreement by virtue of any custom or practice of the parties at variance with the terms hereof.

D.    SPECIFIC PERFORMANCE/INJUNCTIVE RELIEF.

Nothing herein contained shall bar Licensor's right to obtain specific performance of the provisions of this Agreement and injunctive relief against threatened conduct that will cause it loss or damage, under customary equity rules, including without limitation, applicable rules for obtaining restraining orders and preliminary injunctions. Area Licensee and each of its Owners agrees that Licensor may have such injunctive relief, without bond, but upon due notice, in addition to such further and other relief as may be available at equity or law, and the sole remedy of Area Licensee and its Owners, in the event of the entry of such injunction, shall be the dissolution of such injunction, if warranted, upon hearing duly had (all claims for damages by reason of the wrongful issuance of any such injunction being expressly waived hereby). Area Licensee and each of its Owners acknowledges that any violation of Section 8A, 8C or 11B would result in irreparable injury to Licensor for which no adequate remedy at law may be available. Accordingly, Area Licensee and each of its Owners consents to the issuance of an injunction at the request of Licensor (without posting a bond or other security) prohibiting any conduct in violation of those sections and agrees that the existence of any claims Area Licensee or any of its Owners may have against Licensor, whether or not arising herefrom, shall not constitute a defense to the enforcement of any of those Sections.

E.    EXERCISE OF RIGHTS OF PARTIES.

Except as otherwise explicitly provided herein, the rights of Licensor and Area Licensee hereunder are cumulative and no exercise or enforcement by Licensor or Area Licensee of any right or remedy hereunder shall preclude the exercise or enforcement by Licensor or Area Licensee of any other right or remedy hereunder which Licensor or Area Licensee is entitled to enforce by law. Notwithstanding the foregoing, and except as otherwise prohibited or limited by law, any failure, neglect, or delay of a party to assert any breach or violation of any legal or equitable right arising from or in connection with this Agreement, shall constitute a waiver of such right and shall preclude the exercise or enforcement of any legal or equitable remedy arising therefrom, unless written notice specifying such breach or violation is provided to the other party within twelve (12) months after the later of: (1) the date of such breach or violation; or (2) the date of discovery of the facts (or the date the facts could have been discovered, using reasonable diligence) giving rise to such breach or violation.

F.    COSTS AND ATTORNEYS' FEES.

If a claim for amounts owed by Area Licensee to Licensor or any of its Affiliates is asserted in any judicial proceeding or appeal thereof, of if Licensor is required to enforce this Agreement in a

judicial or arbitration proceeding or appeal thereof, Licensor, if it prevails in such proceeding, shall be awarded its costs and expenses including, but not limited, reasonable accounting, paralegal, expert witness, attorneys' fees, whether incurred prior to, in preparation for or in contemplation of the filing of any written demand, claim, action, hearing or proceeding to enforce the obligations of the Agreement.

G.     GOVERNING LAW/CONSENT TO JURISDICTION.

This Agreement shall be interpreted and construed under the laws of the State of Florida. In the event of any conflict of law, the laws of Florida shall prevail, without regard to the application of Florida conflict of law principles. If, however, any provision of this Agreement would not be enforceable under the laws of Florida, and if the Development Area is predominantly located outside of Florida and such provision would be enforceable under the laws of the state in which the Development Area is predominantly located, then such provision shall be interpreted and construed under the laws of that state. Nothing in this Section is intended to subject this Agreement to any license or similar law, rule or regulation of the State of Florida to which it would not otherwise be subject.

H.     LIMITATIONS ON LEGAL ACTIONS.

Except with respect to obligations regarding the Confidential Information set forth in Section 8A hereof, Licensor and Area Licensee (and its Owners) waive, to the fullest extent permitted by law, any right to or claim for any punitive or exemplary damages against the other and agree that, in the event of a dispute between them, the party making any claim directly or indirectly arising from or relating to this Agreement shall be limited to recovery of actual and consequential damages sustained.

Area Licensee agrees that, for the license system of Licensor to function properly, Licensor must not be burdened with the costs of litigating system-wide disputes. Accordingly, any disagreement between Licensor and Area Licensee (and its Owners) shall be considered unique as to its facts and shall not be brought as a class action, and Area Licensee (and each of its Owners) waives any right to proceed against Licensor by way of class action. In any legal action between the parties, the court shall not be precluded from making its own independent determination of the issues in question, notwithstanding the similarity of issues in any other legal action involving Licensor and any other Area Licensee or Licensee, and each party waives the right to claim that a prior disposition of the same or similar issues preclude such independent determination.

Furthermore, the parties agree that any legal action in connection with this Agreement shall be tried to the court sitting without a jury, notwithstanding any state or federal constitutional or statutory rights, and all parties hereto waive any right to have any action tried by jury.

I.     BINDING EFFECT.

This Agreement is binding upon the parties hereto and their respective executors, administrators, heirs, assigns and successors in interest and, except or otherwise expressly provided herein, shall not be modified except by written agreement signed by both Area Licensee and Licensor.

J.     CONSTRUCTION.

The preambles, acknowledgments, and exhibits to this Agreement are a part of this Agreement, which constitutes the entire agreement of the parties, and there are no other oral or written agreements,



understandings, representations or statements between Licensor and Area Licensee relating to the subject matter of this Agreement, that either party may or does rely upon or that will have any force or effect. Nothing in this Agreement is intended or shall be deemed to confer any rights or remedies upon any person or legal entity not a party hereto.

Except where this Agreement expressly obligates Licensor to reasonably approve or consent (or not to unreasonably withhold its approval of or consent) to any action or request by Area Licensee Licensor has the absolute right for any reason to refuse any request by Area Licensee or to withhold its approval of or consent to any action by Area Licensee.

The headings of the sections and subsections hereof are for convenience only and do not limit or construe the contents of such sections or subsections. The term "Affiliate" is applicable to any entity directly or indirectly owned or controlled by, under common control with, or owning or controlling, the referenced party. The term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of an entity, whether through ownership of voting securities, by contract, or otherwise. The term "Area Licensee" as used herein is applicable to one or more persons, a corporation or a partnership and its owners, as the case may be. If two or more persons are at any time Area Licensee hereunder, whether or not as partners or joint venturers or otherwise, their obligations and liabilities to Licensor shall be joint and several. References to a controlling interest in an entity shall mean more than fifty percent (50%) of the equity or voting control of such entity.

This agreement shall be executed in multiple copies, each of which shall be deemed an original. Time is of the essence in this agreement.

IN WITNESS WHEREOF, the parties hereto have executed, sealed and delivered this Agreement in two (2) counterparts on the day and year first above written.

LICENSOR

PLASTIC2OIL LAND, INC., a Nevada Corporation

By:_____
Printed Name: John Bordynuik
Title: CEO

AREA LICENSEE

AS PTO, LLC (a Florida limited liability company)

By:_____
Printed Name: Al Sousa
Title: Manager

understandings, representations or statements between Licensor and Area Licensee relating to the subje
matter of this Agreement, that either party may or does rely upon or that will have any force or effec
Nothing in this Agreement is intended or shall be deemed to confer any rights or remedies upon an
person or legal entity not a party hereto.

Except where this Agreement expressly obligates Licensor to reasonably approve or consent (
not to unreasonably withhold its approval of or consent) to any action or request by Area License
Licensor has the absolute right for any reason to refuse any request by Area Licensee or to withhold i
approval of or consent to any action by Area Licensee.

The headings of the sections and subsections hereof are for convenience only and do not limit
construe the contents of such sections or subsections. The term "Affiliate" is applicable to any enti
directly or indirectly owned or controlled by, under common control with, or owning or controlling, tl
referenced party. The term "control" means the possession, directly or indirectly, of the power to direct
cause the direction of the management and policies of an entity, whether through ownership of votir
securities, by contract, or otherwise. The term "Area Licensee" as used herein is applicable to one
more persons, a corporation or a partnership and its owners, as the case may be. If two or more perso
are at any time Area Licensee hereunder, whether or not as partners or joint venturers or otherwise, the
obligations and liabilities to Licensor shall be joint and several. References to a controlling interest in
entity shall mean more than fifty percent (50%) of the equity or voting control of such entity.

This agreement shall be executed in multiple copies, each of which shall be deemed an origin
Time is of the essence in this agreement.

IN WITNESS WHEREOF, the parties hereto have executed, sealed and delivered th
Agreement in two (2) counterparts on the day and year first above written.


LICENSOR                                        AREA LICENSEE

PLASTIC2OIL LAND, INC., a Nevada Corporation     AS PTO, LLC (a Florida limited liabili
                                                 company)


By: _____                     _____
Printed Name: John Bordynuik
Title: CEO

                                                 By: _____
                                                 Printed Name: Al Sousa
                                                 Title: Manager

## EXHIBIT A

DEVELOPMENT AREA –State Of Florida

INITIAL AREA DEVELOPMENT FEE - WAIVED

TERM OF AGREEMENT –Agreement shall be for 20 years. At any time Licensor shall have the right, but not the obligation, to buy out the ASPTO, LLC interests at a multiple of 10 times EBITDA.

So long as the Area Licensee is not in default under the terms of this Agreement, the term of the Agreement shall be renewable at the option of ASPTO, LLC for up to an additional 20 years.

Forty Five (45) P2O sites are contemplated by this ADA and shall be developed, at a minimum, as follows:

      i.   Year 1 = 7
      ii.  Year 2 = 12
      iii. Year 3 = 13
      iv.  Years 4 to 6 = 13

The transaction contemplates that Licensor will finance the start up of at least nineteen (19) units projected for completion within the 24 month period subsequent to the validation procedures ("Validation") as defined herein. Financing provided by Licensor shall not require personal guarantees from AS PTO, LLC (although sub-licensees may be required to guarantee) and interest rates and terms shall be at commercially reasonable terms as mutually agreed upon by the Parties.

The Term of the Agreement begins 180 days after "Validation". Validation requires (i) Licensor will provide third party validation[1] that the 20mt20MT P2O unit being constructed in New York has met all EPA, DEC and local permit criteria,; (ii) that the process will convert a minimum of 20 tons of waste plastic per day, per processor (average) to a minimum of 108 barrels (average per day) of fuel grade oil on a batch or continuous basis over an uninterrupted 30 day period; and (iii) that all of the necessary hardware and equipment is, or will be readily available at prices that are within the dollar range as depicted below.

| Range of Expected Start-up Costs | | |
| --- | --- | --- |
| | Range | |
| Start-up Costs | 90,000 | 400,000 |
| P2O processor and other Equip | 160,000 | 200,000 |
| Hard Costs | 275,000 | 730,000 |
| Total funding required | 625,000 | 1,330,000 |

---

[1] Third party validation includes testing, monitoring and reporting by Islechem in the form of a written report that has been accepted by the EPA and New York's DEC. AS will retain the firm of URS to review each such report and each such report shall be satisfactory to URS. (Has the timeframe for EPA and DEC review/acceptance been estimated by Islechem? If such reviews are SOP and timely, my concerns are moot. However, if such reviews are time consuming, the commencement of the term of the Agreement could be delayed considerably. Is acceptance of written reports a requirement for operating permits for the P2O units?

EXHIBIT A

DEVELOPMENT AREA –State Of Florida

INITIAL AREA DEVELOPMENT FEE - WAIVED

TERM OF AGREEMENT –Agreement shall be for 20 years. At any time Licensor shall have the right, but not the obligation, to buy out the ASPTO, LLC interests at a multiple of 10 times EBITDA.

So long as the Area Licensee is not in default under the terms of this Agreement, the term of the Agreement shall be renewable at the option of ASPTO, LLC for up to an additional 20 years.

Forty Five (45) P2O sites are contemplated by this ADA and shall be developed, at a minimum, as follows:

     i.   Year 1 = 7
    ii.  Year 2 = 12
  iii.  Year 3 = 13
  iv.  Years 4 to 6 = 13

    The transaction contemplates that Licensor will finance the start up of at least nineteen (19) units projected for completion within the 24 month period subsequent to the validation procedures ("Validation") as defined herein. Financing provided by Licensor shall not require personal guarantees from AS PTO, LLC (although sub-licensees may be required to guarantee) and interest rates and terms shall be at commercially reasonable terms as mutually agreed upon by the Parties.

    The Term of the Agreement begins 180 days after "Validation". Validation requires (i) Licensor will provide third party validation[1] that the 20mt20MT P2O unit being constructed in New York has met all EPA, DEC and local permit criteria,; (ii) that the process will convert a minimum of 20 tons of waste plastic per day, per processor (average) to a minimum of 108 barrels (average per day) of fuel grade oil on a batch or continuous basis over an uninterrupted 30 day period; and (iii) that all of the necessary hardware and equipment is, or will be readily available at prices that are within the dollar range as depicted below.

| Range of Expected Start-up Costs | | |
|---|---|---|
| | Range | |
| Start-up Costs | 90,000 | 400,000 |
| P2O processor and other Equip | 160,000 | 200,000 |
| Hard Costs | 275,000 | 730,000 |
| Total funding required | 525,000 | 1,330,000 |

---

[1] Third party validation includes testing, monitoring and reporting by Islechem in the form of a written report that has been accepted by the EPA and New York's DEC. AS will retain the firm of URS to review each such report and each such report shall be satisfactory to URS. (Has the timeframe for EPA and DEC review/acceptance been estimated by Islechem? If such reviews are SOP and timely, my concerns are moot. However, if such reviews are time consuming, the commencement of the term of the Agreement could be delayed considerably. Is acceptance of written reports a requirement for operating permits for the P2O units?